**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3652-19

KENNETH HAGEL,

       Plaintiff-Respondent/
       Cross-Appellant,

v.

KEVIN DAVENPORT,
individually, and in his official
capacity as Chief of the BOROUGH
OF SEA GIRT POLICE
DEPARTMENT,

       Defendant/Respondent,

and

THE BOROUGH OF SEA GIRT
POLICE DEPARTMENT and
THE BOROUGH OF SEA GIRT,

       Defendants-Appellants/
       Cross-Respondents.

_____

Argued January 30, 2024 – Decided February 6, 2024

Before Judges Haas, Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1532-14.

Anthony P. Seijas argued the cause for appellants/cross-respondents Borough of Sea Girt Police Department and Borough of Sea Girt (Cleary Giacobbe Alfieri Jacobs LLC, attorneys; Anthony P. Seijas, of counsel and on the briefs; Jessica Vanessa Henry, on the briefs).

Matthew A. Peluso argued the cause for respondent/cross-appellant Kenneth Hagel (Matthew A. Peluso, Esq., LLC, attorney; Matthew A. Peluso, on the brief).

Boris Shapiro argued the cause for respondent Kevin Davenport (Apruzzese, McDermott, Mastro & Murphy, PC, attorneys; Art Richard Thibault, Jr., of counsel and on the brief; Boris Shapiro, on the brief).

PER CURIAM

Plaintiff Kenneth Hagel was a full-time patrol officer in the Borough of Sea Girt Police Department (the Department). In 2013, he was denied the opportunity to apply for a sergeant position, in a process that ended in February 2014 with the promotion of another patrol officer to the position (the 2013 promotion process). In April 2014, plaintiff began this action against the Department, the Borough of Sea Girt (the Borough), and Chief of Police Kevin Davenport, a long-time Department employee who rose to that rank. Plaintiff claimed that defendants violated the Law Against Discrimination, N.J.S.A. 10:5-

2

1 to -42 (the LAD), by denying him the promotion and by creating a hostile work environment as discrimination against him for also being a member of the United States Navy Reserve (the Navy Reserve).

In 2016, plaintiff declined to participate in the next sergeant promotion process and retired. Based on what he learned from the deposition in this action of another former patrolman, he amended his complaint to add a count that defendants' LAD violations were also discrimination against him based on misperceived sexual orientation. Motions for summary judgment and reconsideration resulted in the dismissal of Davenport from the action in his personal capacity, and the dismissal of the hostile work environment claim against the Borough and Department.

The failure to promote claim was tried to a jury, which found for plaintiff. The jury awarded compensatory damages of $262,000 for back pay and front pay and $500,000 for emotional distress. The jury also found the Borough liable for punitive damages of $1 million.

The Borough and Department moved for a new trial on several grounds, including that the court erroneously charged the jury on failure to promote under two LAD theories that defendants believed to be incompatible. The court denied the motion but remitted the punitive damages award to $750,000. The court also

awarded plaintiff prejudgment interest on the back pay and emotional distress awards, and counsel fees.

The Borough and Department now appeal the denial of their summary judgment motion to dismiss the failure to promote claim and the denial of their motion for new trial. Plaintiff cross-appeals the dismissal on summary judgment of the hostile work environment claim, the remittitur of the punitive damages award, the denial of prejudgment interest on the award for front pay, and the amount of the counsel fee award.

Having considered the parties' contentions in light of the record and the applicable law, we affirm.

I.

A.    Plaintiff's military reserve service and hiring by the Department.

Plaintiff graduated from high school in 1984, joined the United States Navy in 1985, and served a three-year tour of active duty. He returned home in 1988 and worked at various nonmilitary jobs, in addition to enlisting for three years in the Navy's active reserve. He was assigned to the facility formerly known as Naval Air Station Lakehurst, and he reported for training drills one weekend per month, mostly at Lakehurst, plus two weeks of annual training. In September or October of each year, the Navy would provide the drill dates for

the following year, while the timing of the annual training was less predictable. Plaintiff continued reenlisting in the active reserve throughout the relevant period.

In 1988, plaintiff began working for the Department as a part-time employee. In early 1989, he completed the police academy program, and in April of that year he received his first Department assignment, which was probationary patrol officer. In 1992, the Department assigned him to a detective position, which was not a promotion in rank or salary. In 1993 the Department hired him full-time as a regular patrolman. During plaintiff's time in the Department, he was the only full-time officer with military service obligations.

Plaintiff believed that the Department handled his weekend absences by putting an officer on his shifts one month, and offering them to other officers as overtime the next month. For 1988 to 2007, he did not recall any problem with the scheduling of his weekend drills or annual training.

B.    Early allegations of harassment, before the 2006-2007 promotion process.

Plaintiff testified that he received an envelope in his work mailbox with a drawing on it, and he did not know who made it. The drawing depicted male genitalia. Plaintiff deposed that he reported the envelope to whoever was his "first line supervisor" that day, but nothing was done. He "continually" received

bills for magazine subscriptions and other items that he had not ordered, and he reported the incidents as they occurred to superior officers including the chief of police, but "nothing ever got done."

C.    Davenport's promotion in 2007 and takeover of Department scheduling.

The 2006-2007 promotional process had five stages:  a written standardized test; an interview or oral exam by a panel of police chiefs from other municipalities; an interview with the Department's commanding officers; an interview with the Borough Council; and an essay test.  Davenport had the highest overall score and received one of the two sergeant positions.  Plaintiff and John O'Connor had equal overall scores, with plaintiff scoring higher on the written portions and O'Connor scoring higher on the interview portions, but O'Connor received the second position because he was senior to plaintiff.

After his promotion, Davenport took over Department scheduling. Plaintiff testified that Davenport questioned him frequently about his military service dates.  Plaintiff frequently saw that the dates he had given Davenport were not in the schedule, and when he advised Davenport that they were not, "the response I got was, Hagel, you're a pain in the ass.  You and your military are a pain in the ass with the schedule."

6

Plaintiff testified that Davenport's periodic questions about whether he was, or had been, at his Navy duty locations made him believe that Davenport doubted that he was really performing his reserve duties. He added that Davenport also told him, more than once, that the Department would never hire another full-time officer who was in the reserves, and that being in the reserves meant that plaintiff would never get promoted.

Davenport testified that the procedure for scheduling plaintiff's military reserve duty was for plaintiff to email him a list of projected dates for the whole year, subject to change. Sometimes the reserve duty would coincide with plaintiff's days off and no schedule change was needed. When coverage for plaintiff was needed, the Department would "alternate" between assigning another officer and using overtime. Davenport denied calling plaintiff's military duties or the need to change the schedule to accommodate them "a pain in the ass."

D.    Other evidence of Davenport's animus against plaintiff's military service.

Michael Lance was a police officer in the Department from 2007 until November 2012. He worked part-time for the Department and he was also a full-time police officer for the Department of Defense, stationed variously at Lakehurst and other bases in the area.

Lance testified that plaintiff's military drills frustrated Davenport because he would have to find a part-time officer to cover plaintiff's absences or pay overtime. When asked if he heard Davenport make "discriminatory or derogatory remarks" about plaintiff's military service, he said that he had. He testified that Davenport believed that some of the time plaintiff took off from work for drills was "possibly fraudulent," because plaintiff's military rank would give him access to fabricate the documents showing the date and location of a drill. On one occasion in 2010 or 2011, Davenport asked him to confirm that plaintiff was really at the drill location by looking for plaintiff's car there. Lance did so, spoke with plaintiff at the location without disclosing Davenport's request, and then reported back to Davenport.

Lance related an undated conversation he had with Davenport about the 2006-2007 promotion process. Davenport told him that plaintiff scored higher than O'Connor's on the written exam, but O'Connor got the higher score on the verbal exam conducted by the Borough Council. Davenport said that O'Connor was not very smart, so for him to score higher with the Borough Council and get promoted over plaintiff showed that no "military guy" would be promoted to sergeant because that would leave the Department with no supervisor during any military service.

Lance also testified about a conversation with Davenport when they were patrolling together. He was concerned about being laid off from his full-time military police position due to budget cuts, and he asked Davenport if going into the military reserves would "help my chances of becoming a full-time officer" in the Department. Davenport replied that it would be "the biggest mistake" he could make, because plaintiff "ruined that for anyone" and the Department "would never hire anyone else from the military again."

Lance left the Department at the end of 2012. When asked if he was testifying because he was "a disgruntled former employee," he replied that "I like Sergeant Davenport" and "You don't have any idea how hard this is for me. But I can't imagine how it would be to be [plaintiff]."

E.     Alleged harassment of plaintiff from 2007 to 2011.

1.     Plaintiff's testimony. Plaintiff described a printout of a photo of himself in uniform attending the annual "Navy Ball" that he posted to his Facebook account. Sometime in 2007 or 2008, he found the printout inside his locker at the Department. Officers usually closed their lockers and left the key in the lock without locking it. At the top of the printout were the words "An American War Hero" followed by numerous question marks, and then the words "Or American zero . . . " in capital letters. There was a line pointing to plaintiff's

mouth from the words "Chafed [sic] lips." An arrow pointed to plaintiff's bow tie, from the words "Crooked bow tie. This is from some chief sailor getting his pole lubed by Hagel," which plaintiff understood as an accusation of performing fellatio on another sailor. The printout also included a number of derogatory comments about the service stripes on plaintiff's uniform.

Plaintiff believed that Davenport made the document, based on the similarity of its comments to other comments that Davenport had made to him. Plaintiff said that the document and other items like it "would be posted around headquarters numerous times." Plaintiff complained by expressing his "disgust" at the disrespect for himself and the military, and "supervisors" would do nothing beyond taking them down "and possibly telling people to knock it off," yet they kept appearing in an "unending amount."

Plaintiff testified about two other pictures of him that he had kept in his locker on separate occasions. One was taken when he was in Kuwait and the other was taken while he was in New Orleans and in uniform. On each picture, someone drew the letter "L" on his forehead. Yet another picture of plaintiff with the letter "L" drawn on the forehead compared him to "the American Blowfish," which supposedly had the defensive "ability to inflate his chest

around enemies to make himself appear bigger than he really is." Plaintiff took that as mockery of his size as well as of his military service.

Plaintiff believed Davenport made those documents because the "L" in them resembled the ones he witnessed Davenport drawing on other photos or pictures. That included "the penis drawings." One of them was a photograph of plaintiff and the Department's Sergeant Fred Potts, which had been hanging in headquarters "for a little while" before someone drew male genitalia on it pointing toward plaintiff's mouth.

2.    Lance's testimony. Lance heard Davenport comment that "all Navy men are gay," and on several occasions he heard Davenport say that Navy men including plaintiff were "pole-smokers," a reference to oral sex. Lance witnessed Davenport draw an "L" on plaintiff's forehead on more than one photograph, including one from plaintiff's Facebook account when plaintiff left it open, and he saw Davenport draw penises on two other photos.

Lance saw pictures of women with plaintiff's face superimposed on them, and Davenport showed them to Lance. When asked how many times Davenport showed such pictures while Lance and others were around, Lance estimated "at least twenty times," which did not include "them being plastered throughout the entire police department."

Lance saw Davenport "a few times" deface a photo of plaintiff and slip it under the door of plaintiff's locker with a comment like "Here you go. Add this to your file, dick, asshole." Also while at work, Lance saw Davenport cut a manila envelope to the size and shape of a license plate, put it in a printer to add the typed words "I'm gay 4 U," and tape it to the rear license plate of plaintiff's personal vehicle.

3. Testimony from Davenport and other defense witnesses. When Davenport was asked if he remembered, from 2007 onward, drawing penises on any documents or photos, or making any other derogatory items, he said that he did not. He denied making any of the items based on photos of plaintiff, and he denied making the "I'm gay 4 U" fake license plate.

Captain Justin Macko started with the Department in 1999. When shown some of the pictures with the offending markings, Macko denied seeing them. Lieutenant James Kremp similarly did not remember seeing the pictures shown to him, and Officer Douglas Nesbitt said that he had only seen the photos without markings. O'Connor did not recall seeing any of those photos.

F. Plaintiff's year-long military deployment.

In December 2011, the Navy ordered plaintiff to report for a one-year assignment that began with mission training followed by deployment to Africa

in May 2012. Plaintiff served in the mission until August 2012, when he was evacuated after sustaining a head and neck injury. He was hospitalized at military facilities until mid-November 2012, when he was cleared as being ready to resume duty. The Navy released plaintiff from active duty in December 2012 as originally scheduled.

Davenport testified that the Borough was not going to continue medical benefits for plaintiff and his family during his year-long deployment to Africa. However, Davenport approached the Borough Administrator and the mayor to tell them that discontinuing plaintiff's medical benefits was the wrong thing to do, and the Borough Council decided to continue them.

Before his discharge from active duty, plaintiff had become interested in serving in the Navy Reserve as the commanding officer of a Navy security force unit. His application was accepted and he received orders effective as of December 1, 2012. The duty schedule was still one weekend per month plus two weeks of annual training. His annual training for 2013 was in January.

The Department compelled plaintiff to use his accrued use-or-lose vacation time before he returned to work. Between that and his January 2013 annual training, plaintiff did not return to work until February 2013.

G.    More alleged harassment.

Plaintiff testified that, before he returned to work, Davenport repeatedly asked him for documentation of his medical fitness for duty beyond the sole form that was required and that plaintiff had submitted. Neither the chief of police nor the lieutenant who previously had that supervisory duty had asked for such additional documentation. Plaintiff considered it further harassment stemming from Davenport's animus against his military service.

Plaintiff explained that if a weekend drill was canceled, such as for weather that impeded travel, he would inform Davenport and report to work. In February 2013, when he informed Davenport that he would be reporting for work instead of to a drill that had been canceled due to a snowstorm, Davenport's response was, "you've got to be fucking kidding me. What a [b]unch of pussies. What kind of military do we have? A bunch of pussies can't come to drill weekend in a snowstorm."

When plaintiff reported to work, he signed into the computerized schedule system that all officers used, and he saw that Davenport had marked the change not as "RD," the proper code for military reserve duty, but as "ML," the code for maternity leave. In the comment section for the change, Davenport wrote "Reserves canceled, LMAO," meaning "laughing my ass off."

## H.  Preparation for, and announcement of, the 2013 promotion process.

In May 2013, in anticipation of Chief Conway's retirement at the end of the following month, Davenport was promoted from sergeant to captain without first being named a lieutenant.  Davenport was also named as the acting chief of the Department as of July 1, 2013, at his captain's salary.  O'Connor took over Department scheduling from Davenport.  He testified that Davenport told him soon thereafter to ask plaintiff for the orders supporting his military drills, which O'Connor called a new practice.

Davenport testified that on June 7, 2013, he issued a memo stating that he would announce in the fall "the exact procedures" for a sergeant promotion process.  He issued it through the Department's document management system (DMS), which was operated by Patrolman John DeMillio.

As acting chief, Davenport continued the promotion application deadline that Chief Conway had instituted.  The deadline was that an "officer intending to participate in the process must submit a letter of intent no later than [ten] days after the announcement."  Davenport could have chosen a longer response time than ten days, but he said that period was appropriate because he expected all the promotional testing to be completed during the first week of December 2013.

However, Davenport exercised his discretion as commanding officer to alter the promotional testing and scoring process. He changed the essay from a test devised and graded by police chiefs from other municipalities to an essay test that he would devise and grade himself. He also eliminated the written test, and he assigned its former weight of twenty percent to the recommendation he would make as acting chief.

The promotion process was "announced" on September 27, 2013, but not through DMS. DeMillio was eligible to apply, and Davenport said that he did not want to give him the unfair advantage of handling the announcement before other officers saw it.

Instead, Davenport put a promotional packet in the officers' mailboxes that evening. He testified that, later the same evening, he had "a conversation with [plaintiff] about the envelope and [Davenport] made sure he got it." Plaintiff allegedly replied, "Yes, but I did not look at it yet." The envelope of the promotional packet had only the recipient's last name, with no timestamp. The one-page notice inside the envelope stated that the promotional process was "tentatively scheduled to begin December 2[], 2013"

The notice required officers interested in applying to convert it into a letter of intent by writing their initials next to its pre-worded statement "I WISH TO

16

TAKE the Sergeant's Exam" and "returning it to Lieutenant James Kremp by October 7[], 2013."  Davenport said that he checked officer work schedules to make sure that they would not be out for the entire ten-day response period.  He stated that plaintiff would be out for six days in that period, and possibly one more depending on when he took a comp day.

I.     Plaintiff's effort to participate in the 2013 promotional process.

Plaintiff testified that the Department used DMS for all important announcements.  Davenport's June 7, 2013, preview announcement about the upcoming sergeant promotion process was in DMS, but Davenport's September 27, 2013 formal announcement of it was not.  Plaintiff believed that he would have noticed the formal announcement if it had been in DMS, because he would have noticed it upon logging in, and DMS made officers read announcements and acknowledge having read them.

The formal announcement was instead placed in plaintiff's Department mailbox.  It was inside a letter-sized manila envelope with only his last name, with no indication that it was time-sensitive, and without the return address or reference to the contents that mail from the State of New Jersey would have carried.

Plaintiff said that he was scheduled to be out from September 28 through September 30, 2013, so the first day on which he could have seen the envelope was October 1. He could not say when he first noticed the envelope. He admitted that he moved it from his mailbox to his locker without opening it, and that it remained in his locker until he did open it.

In any event, plaintiff testified that he did not read the announcement until October 10, 2013. On that day, he executed it to convert it into a letter of intent and tried to give it to Kremp. Kremp told him that he could not accept it "because it was late" and added that plaintiff needed to talk to Davenport. Kremp did not tell plaintiff thereafter whether Davenport had anything to say. Plaintiff was out of work the following week for a medical procedure and a follow-up to remove a cancerous skin lesion.

When plaintiff returned to work a few days later before October 22, 2013, the next communication to hm concerning the promotion process occurred. He said that Davenport relieved him at a shift change and asked him, "what's going on with you and the sergeant's test?" Plaintiff replied that he had told Kremp he wanted to apply, and that Kremp "was going to bring it to your attention." Plaintiff testified that the only "response I got" from Davenport in that exchange was that he could not participate in the exam because the purchase order for the

test had already been submitted. Plaintiff "figured I was done" and that "[t]here was nothing left to do about it."

Kremp testified that he did not tell plaintiff that he would talk to Davenport for him about the promotion process. He said that he heard nothing from plaintiff until October 11, 2013, when he started his day shift while plaintiff was working overtime after a night shift. Plaintiff told him that he had not opened his packet in time, and Kremp responded that he would "have to talk to the chief about it." Kremp offered to cover plaintiff's school-zone duty that day so that plaintiff could speak with Davenport about it when Davenport came in. However, when Kremp returned to headquarters, plaintiff had already left. Kremp asked Davenport if plaintiff had talked to him, and Davenport said that plaintiff had not.

Davenport testified that Kremp related plaintiff's approach to him about missing the deadline, along with his response that plaintiff needed to talk to the chief. Davenport did not recall plaintiff speaking to him about wanting to apply for the sergeant position, and then he flatly denied such a conversation, calling it a fabrication.

Davenport said that the only component of the promotion process that needed a purchase order was setting up the interviews with the police chiefs

19

from other municipalities. He did not recall when he submitted the purchase order. When counsel asked if he could have submitted another purchase order if he "needed to schedule another interview," Davenport agreed that he could have. Nothing in the record indicated what expense or administrative difficulties the submission of another purchase order would have entailed.

J.     Conduct and results of the 2013 promotion process.

On December 3, 2013, Davenport sent a memo to the officers participating in the 2013 promotion process that the testing was now scheduled for the week of January 13, 2014. Without referencing that memo, plaintiff testified that he asked O'Connor "just after December 2[]" how the testing was going, and O'Connor told him that it had been postponed. Plaintiff contacted counsel because he thought there had been sufficient time since October 22, 2013, when he clearly told Davenport that he wanted to participate, for Davenport "to have submitted another purchase order and to add my name to the list."

Davenport agreed that plaintiff was qualified to be a sergeant, and that plaintiff had more seniority than the officers who participated in the promotion process. At least some of them had supervisory training, but not the kind that plaintiff said he had from his military work, and which would have been considered if a candidate mentioned it.

20

On January 1, 2014, Davenport was promoted from acting chief of police to full chief.

On February 5, 2014, the Borough Council voted to give the new sergeant position to Justin Macko. Macko testified that he submitted his letter of intent on September 28, 2013, by handing it to Kremp. He received the notice of the promotion process the day before, in his mailbox. According to Macko, it was not unusual to receive documents in his mailbox rather than through DMS, as paychecks and paystubs were placed there, and he also received memos, subpoenas, and correspondence there.

K.    Plaintiff's retirement from the Department.

Sometime in 2014 or 2015, plaintiff found a green blow-up doll at work in the locker room. It was short, which plaintiff took to be a reference to his own height, and it had a penis drawn on it that he said was similar to the drawings of penises on the documents and photos described above. Other officers were "chuckling" when plaintiff arrived at work but stopped when they noticed him, which confirmed his impression that he was the target.

The next sergeant promotion process was tentatively scheduled for March 2016. On January 24, 2016, plaintiff initialed and signed the letter of intent to indicate that he was not interested in participating.

A-3652-19

Plaintiff retired from the Department on June 1, 2016. He continued serving in the Navy Reserve.

Plaintiff's base salary in 2016 was $109,259.80. A sergeant's base salary for 2016 was set in the PBA contract at $119,093.36.

## L. Plaintiff's testimony concerning emotional distress.

Plaintiff testified that he did not want to retire, because he "still enjoyed serving the people of Sea Girt" and he wanted to work another two and one-half years to augment his pension. When asked if his decision to retire was influenced by "Davenport's discriminatory animus and derogatory treatment of you," he responded that it was. He "was under probably the most emotional stress which was causing physical problems that [he had] ever been under in [his] entire life." When Davenport mistreated him as he described, he felt physical symptoms, which he named as stomach and bowel problems and headaches. He "knew [he] was being watched," and every day he went to work feeling physically ill from wondering what was going to happen to him or what to expect when he started his shift.

Plaintiff said that he "was not sleeping," which "caused anxiety, both emotional and physical stress." When asked for the effect on his family life, he replied that it was affected "to the point where I did not want to go out and do

anything[,] just wanted to stay home, stay in the house" and not socialize. He "felt safe at home" and "did not want to go out if [he] did not have to," because he was fearful about being watched and "scrutinized" about everything he did.

When plaintiff was at work, he was "[c]onstantly on guard" about being "set up somehow" with the potential of losing his pension, and that became "a very clear and distinct fear" he had whenever he went to work. In addition, he felt that as long as Davenport was the Police Chief, there was no way he was going to "excel within the Department" or be promoted. He was not "able to perform to my potential" because he was not given "the opportunity to promote, to lead, to provide the type of leadership and mentoring that I had done for all the years in the military."

Plaintiff did not proffer expert evidence about his emotional distress or its connection to the harassment and the denial of promotion.

II.

We now turn to the contentions raised by the Borough and the Department in their appeal, beginning with their challenge to the trial court's denial of their motion for summary judgment on plaintiff's claim that they violated the LAD by failing to promote him during the 2013 promotion process. The court denied the motion after applying the burden-shifting framework set forth in McDonnell

Douglas.[1]  Under that framework, it found that plaintiff had presented a prima facie case that discrimination against his military service had been a motive for defendants' failure to promote him, while defendants satisfied their modest burden of articulating a nondiscriminatory reason by citing plaintiff's failure to submit a timely application.

That gave plaintiff the burden of proving that the articulated reason "was a mere pretext" by showing that discrimination was more likely than not a motive behind the failure to promote him.  The court found that the application's being late by just one day, the subsequent delay in the promotional process, and the large number of comments by Davenport about the undue burden that plaintiff's military service imposed on him and the Department combined to create "sufficient questions of fact related to Chief Davenport's motivation—and through him the [B]orough . . . in determining whether or not to accept the application and whether or not to afford [] plaintiff an opportunity for promotion."

The Borough and the Department argue that Davenport's denial of plaintiff's request to submit a late application did not pose "an issue of fact," because plaintiff failed to make a prima facie case that he validly applied for the

---

[1]  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

promotion, and because he failed to proffer enough evidence for the jury to find at trial that defendants' reason for declining to consider the late application was a pretext for a discriminatory motive. We disagree with defendants' contention.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court, namely, the standard set forth in Rule 4:46-2(c). Conley v. Guerrero, 228 N.J. 339, 346 (2017). Thus, we consider, as the trial court did, whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007). We accord no deference to the trial judge's conclusions on issues of law and review issues of law de novo. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

The LAD prohibits discrimination in hiring, N.J.S.A. 10:5-4, and "in compensation or in terms, conditions or privileges of employment." N.J.S.A. 10:5-12(a). The discrimination must occur "because of" membership in a named

protected class. N.J.S.A. 10:5-4, -12(a). Along with race, creed, age, ancestry, and sex, the LAD names "affectional or sexual orientation," ibid., which includes "being perceived, presumed, or identified by others as having such an orientation." N.J.S.A. 10:5-4, -5(hh). The LAD also names "liability for service in the Armed Forces of the United States." N.J.S.A. 10:5-4, -12(a).

When the LAD claim is a discriminatory failure to promote, the prima facie case has four prongs. Employees must show that: (1) they were members of a class that the LAD protects; (2) they were objectively qualified for the desired position or rank; (3) they were denied the position or rank; and (4) the employer gave the position to persons with similar or lower qualifications. Dixon v. Rutgers, 110 N.J. 432, 443 (1998); Harris v. Middlesex Cnty. Coll., 353 N.J. Super. 31, 42 (App. Div. 2002); Greenberg v. Camden Cnty. Voc. & Tech. Sch., 310 N.J. Super. 189, 198 (App. Div. 1998).

In Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97-98 (1990), our Supreme Court noted its acceptance of the burden-shifting framework developed under McDonnell Douglas, a Title VII case, as the general framework for analyzing LAD claims. "New Jersey courts have traditionally sought guidance from the substantive and procedural standards established under federal law." Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002).

26

Under the burden-shifting framework, the plaintiff must make a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. That shifts the burden to the employer "to articulate some legitimate, nondiscriminatory reason for" its action. Ibid. The plaintiff then gets "a fair opportunity to show that [the] stated reason for" the action "was in fact pretext." Id. at 804.

The case law has developed standards of proof for each of those steps. For the prima facie case, the plaintiff must prove that the action in question occurred "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981) (Burdine). "The evidentiary burden at this stage is rather modest; it is to demonstrate to the court that [the] plaintiff's factual scenario is compatible with discriminatory intent, i.e., that discrimination could be a reason for the employer's action." Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996). The prima facie case is to be determined "solely on the basis of the evidence presented by the plaintiff, irrespective of [the] defendants' efforts to dispute that evidence." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 448 (2005).

Once the prima facie case is established, the second part of the McDonnell Douglas test gives the employer the burden of producing evidence that it had "a legitimate, nondiscriminatory reason" for acting. Burdine, 450 U.S. at 254.

27

That is not a burden of persuasion, which "remains at all times with the plaintiff." Id. at 253-54. The employer only needs to "articulate" a nondiscriminatory reason for its action "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. at 255-60.

Indeed, the employer never has the burden of proving that its proffered reason was the actual reason for its action, "because the burden of proving the actual discrimination lies at all times with the plaintiff." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). The employer's articulation must be "taken as true," and the court's evaluation of it during this second part of the McDonnell Douglas test "can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

If the employer articulates a nondiscriminatory reason, the plaintiff loses the benefit of the presumption established by the prima facie case, Burdine, 450 U.S. at 255-56, and "the factual inquiry proceeds to a new level of specificity." Id. at 255. It is more "specific" because, unlike the acceptance of the employer's reason with "no credibility assessment" as a rebuttal of the prima facie case, the credibility of the employer's reason will be assessed by the jury in its determination of whether the plaintiff has met the ultimate burden of

A-3652-19

establishing a discriminatory reason for the adverse action. <u>St. Mary's</u>, 509 U.S. at 508-11.

In other words, the plaintiff retains the burden of convincing the jury "that the proffered reason was not the true reason for the employment decision," and that burden "merges with the [plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination." <u>Burdine</u>, 450 U.S. at 255-56. <u>Accord</u> <u>Jason v. Showboat Hotel & Casino</u>, 329 N.J. Super. 295, 304 (App. Div. 2000). Instead of relying on the prima facie case or any presumption that it established, the plaintiff must make that showing "either directly by persuading the court that a discriminatory reason more likely motivated the employer[,] or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u> at 256. <u>Accord</u> <u>U.S. Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 714-16 (1983).

If the employer articulates a nondiscriminatory reason, the employee loses the benefit of the presumption established by the prima facie case. <u>Burdine</u>, 450 U.S. at 255-56. To survive the employer's motion for summary judgment, the employee must show a genuine factual dispute about whether the proffered reason was a pretext. <u>Marzano</u>, 91 F.3d at 508. <u>Accord</u> <u>Kelly v. Bally's Grand, Inc.</u>, 285 N.J. Super. 422, 431-32 (App. Div. 1995). An argument "that [the]

defendant's explanations should not be believed" is insufficient; the plaintiff must offer "evidence which raises a doubt as to the credibility of [the] Defendant's stated reason" for its action. Warner v. Fed. Express Corp., 174 F. Supp. 2d 215, 221-23 (D.N.J. 2001). The evidence must give the factfinder a basis to conclude that "each of the legitimate reasons proffered by the defendant . . . was a fabrication," or that "discrimination was more likely than not a motivating or determinative cause of" the action in question. Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

The plaintiff's evidence of pretext may be indirect, Burdine, 450 U.S. at 255-58, or circumstantial. Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 75 (App. Div. 2004). It may even be simply the incredibility of the employer's proffered reason, which, in conjunction with the prima facie case, may be legally sufficient to support the inference that the alleged discriminatory reason was an actual one. St. Mary's, 509 U.S. at 511. Accord DeWees v. RCN Corp., 380 N.J. Super. 511, 528-29 (App. Div. 2005).

The plaintiff does not have to show that the prohibited reason was the employer's sole reason, but rather just that it may have been one of the employer's "but-for" reasons. Fuentes, 32 F.3d at 764. Accord Slohoda v. United Parcel Serv., 207 N.J. Super. 145, 155 (App. Div. 1986). It is at this

stage, the "rebuttal" stage, when the court may first consider the employer's evidence that the prima facie case is in fact unfounded and therefore legally incapable of supporting the discriminatory intent that the employee has the burden of proving.

If the employer has moved for judgment, the employee is entitled to "all legitimate inferences that derive" from his or her prima facie case. Zive, 182 N.J. at 448-49. However, to survive a motion for judgment, the employee "must do more than argue that [the] defendant's explanations should not be believed"; what he or she must offer is "evidence which raises a doubt as to the credibility of [the defendant's] stated reason" for its action. Warner v. Fed. Express Corp., 174 F. Supp. 2d 215, 221-23 (D.N.J. 2001).

After applying these principles to the case at hand, we agree with the trial court that plaintiff made a prima facie case of his intent and effort to participate in the 2013 promotion process. There was evidence that plaintiff stated his intent to Kremp and Davenport, advocated for the opportunity to submit his letter of intent notwithstanding his having missed the deadline by one day, and desisted only after that denial. Plaintiff did not need to make a formal application because he "made every reasonable attempt to convey his interest in the job to the employer," EEOC v. Metal Service Co., 892 F.2d 341, 348 (3d

31

Cir. 1990), and he was either "deterred from applying [by the employer's] discriminatory practices and would have applied for the position but for those practices," Newark Branch, NAACP v. Harrison, 907 F.2d 1408, 1415 (3d Cir. 1990), (citing Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 367-68 (1977)), or he "reasonably believed that a formal application would be futile." Ibid.

Defendants admitted that plaintiff was qualified to be a sergeant, and the lateness of his letter of intent was the sole reason for not letting him apply. Although there was no record of the Department's previously accepting a late submission, there was also no evidence that letting plaintiff submit his letter just one day late would prejudice the conduct of the 2013 promotion process, or more generally prejudice Department administration and morale.

More specifically, the only prejudice that defendants named was the need to obtain an additional purchase order. However, they did not describe the purpose of the purchase orders, and they said nothing to indicate whether the additional time, effort, and expense in obtaining a supplemental purchase order to accommodate plaintiff's late submission would have been substantial or trivial. Furthermore, the letter of intent that candidates needed to submit was a one-page form that they only had to initial and sign; it did not require a post-

submission evaluation, and defendants did not suggest that a one-day delay in accepting it would have affected a testing process that did not start until six weeks after the originally announced date.

The jury was entitled to find that Davenport had made all of the statements and documents described above over a long period of time; that he disparaged plaintiff's military service, either directly for the inconvenience it caused, or indirectly by equating Navy service with homosexuality; and that he did so in a workplace that regarded homosexuality as shameful and as proof of lesser ability to perform the job. Against the weight of that evidence, we agree with the court that a jury could find defendants' reason for failing to promote plaintiff to be so lacking in credibility that the record would support the inference that discriminatory animus against plaintiff's military service was more likely than not a motive behind their failure to let him participate in the 2013 promotion process. Therefore, we affirm the trial court's denial of defendants' motion on plaintiff's failure to promote claim.

## III.

The Borough and Department next argue that the trial court erred by charging the jury on direct evidence of discrimination because they assert plaintiff did not present any such evidence. They argue that direct evidence

33 <span>A-3652-19</span>

means evidence that establishes animus against members of the plaintiff's protected class without requiring an inference or presumption. Furthermore, the discriminatory motive must be shown to have influenced the adverse employment decision, again without requiring an inference or presumption.

Defendants contend that there was no direct evidence in the record that they acted for any reason other than enforcing the application deadline. Therefore, they argue that the court erred when it instructed the jury that defendants had the burden of proving that plaintiff would not have been promoted even in the absence of a prohibited motive. The charge was reversible error because it imposed a burden of proof on defendants when they were only supposed to have a burden of production. According to defendants, it was also reversible error because the court confused the jury by mixing two theories of LAD liability, pretext and "mixed motive," during its instruction.

The trial court denied defendants' new trial motion after finding there was sufficient direct evidence of discrimination to justify giving the jury instructions conforming to the mixed-motive theory. We agree with the court's determination. While there are differences between the pretext and mixed-motive frameworks, both theories applied on this record, and the court instructed the jury in a manner that accorded with each theory without conflating them.

34

When reviewing claims of error in the jury charge, a court must read the charge as a whole. State v. Marshall, 123 N.J. 1, 135-36 (1991). "Reversible error . . . will not be found where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect." Fischer v. Canario, 143 N.J. 235, 254 (1996).

Because "[a]ppropriate and proper charges to a jury are essential for a fair trial," State v. Green, 86 N.J. 281, 287 (1981), erroneous instructions on material issues are usually presumed to be reversible error. State v. Crisantos, 102 N.J. 265, 273 (1986). Such errors can be excused only if they are "harmless beyond a reasonable doubt," ibid., and they are generally considered to be "poor candidates for rehabilitation under the harmless error philosophy." State v. Simon, 79 N.J. 191, 206 (1979). Error on a material part of the charge is presumed to be reversible. State v. Martin, 119 N.J. 2, 15 (1990). In addition, "[a] jury instruction that has no basis in the evidence is insupportable, as it tends to mislead the jury." Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 257 (2015) (quoting Dynasty, Inc. v. Princeton Ins. Co., 165 N.J. 1, 13-14 (2000)).

Charges that do not mislead the jury into an incorrect application of the law are not grounds for reversal. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J.

396, 418 (1997).  "Courts uphold even erroneous jury instructions when those instructions are incapable of producing an unjust result or prejudicing substantial rights."  Ibid. (quoting Fisch v. Bellshot, 135 N.J. 374, 392 (1994)).

A.    Direct versus indirect evidence, or "pretext" versus "mixed motive."

As an alternative to showing that the employer's proffered nondiscriminatory reason was a pretext, the employee may show that the employer had a "mixed motive" for taking the challenged action.  Fleming v. Corr. Healthcare Solutions, Inc., 164 N.J. 90, 100 (2000).  A mixed-motive case requires direct evidence of the discrimination, which is harder to develop than the "rather modest" prima facie case needed for a pretext claim.  A.D.P. v. ExxonMobil Rsch. & Eng'g Co., 428 N.J. Super. 518, 532 (App. Div. 2012) (quoting Myers v. AT & T, 380 N.J. Super. 443, 453 (App. Div. 2005)).  Accordingly, if an employee has direct evidence, "the McDonnell Douglas analysis does not apply."  Smith v. Millville Rescue Squad, 225 N.J. 373, 396 (2016) (quoting A.D.P., 428 N.J. Super. at 533).

The employee must present direct evidence that the employer "placed substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action."  McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 527 (2003) (citing Price Waterhouse v. Hopkins, 490 U.S. 228,

244-45 (1989)).[2]  When a plaintiff with a mixed-motive claim makes such a showing, it creates a presumption that the employer acted at least in part on the prohibited motive.  Fleming, 164 N.J. at 101.  The employer may avoid liability only by establishing the affirmative defense that "it would have made the same decision if illegal bias had played no role in the employment decision."  Id. at 100 (quoting Jackson v. Ga.-Pa. Corp., 296 N.J. Super. 1, 18 (App. Div. 1996)).  Direct evidence establishes a prima facie case, Bergen Com. Bank v. Sisler, 157 N.J. 188, 209 (1999), and direct evidence that withstands a summary judgment motion shifts the burden of persuasion to the employer.  See ibid.

Direct evidence of an LAD violation means evidence "which if believed, proves [the] existence of [a] fact in issue without inference or presumption."  Sisler, 157 N.J. at 208 (alterations and emphasis in original) (quoting Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1558 n.3 (11th Cir. 1988)).  The direct

---

[2]  Subsequent federal legislation in response to Price Waterhouse ensured that the term "substantial" was not used to require the prohibited motive to be the predominant factor.  Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (codified as 42 U.S.C. § 2000e-2(m)) ("an unlawful employment practice is established when" a prohibited discriminatory motive "was a motivating factor for any employment practice, even though other factors also motivated the practice.")  See O'Brien v. Telcordia Techs., Inc., 420 N.J. Super. 256, 263-64 (App. Div. 2011) (the enactment responded to Price Waterhouse's "substantial role" holding; Desert Palace, Inc. v. Costa, 539 U.S. 90, 98-99 (2003) (1991 enactment left no room for a "special" or "heightened" proof requirement).

evidence must demonstrate two things: "not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." Smith, 225 N.J. at 394 (quoting Sisler, 157 N.J. at 208).

That is, in addition to presenting direct evidence of the hostility of "a decisionmaker associated with the decisionmaking process," the plaintiff must also present direct evidence that "a statement made by [that person] actually bore on the employment decision at issue and communicated proscribed animus." Id. at 394-95 (quoting McDevitt, 175 N.J. at 528). "Federal courts have held that comments by individuals outside the decision making process are considered stray remarks, which on their own are inadequate to support an inference of discrimination." Grasso v. W. N.Y. Bd. of Educ., 364 N.J. Super. 109, 118 (App. Div. 2003) (citing Walden v. Ga.-Pac. Corp., 126 F.3d 506, 531 3d Cir. 1997)). However, "discriminatory comments made by one with input into the decision-making process are not stray remarks." Ibid. (citing Abramson v. William Paterson Coll., 260 F.3d 265, 286 (3d Cir. 2001)).

While the plaintiff's evidence, if true, must directly indicate the proscribed animus, and must also directly indicate the existence of an expression of animus that "bore on the employment decision," the case law does not require an

admission by the employer. Instead, it allows circumstantial evidence that would directly reflect the animus if true, and furthermore, it allows circumstantial evidence to place such indications of animus within the decisionmaking process. Desert Palace, 539 U.S. at 99-102. Even though the evidence must support those elements "without inference or presumption" if true, McDevitt, 175 N.J. at 528 (quoting Sisler, 157 N.J. at 208), "we have nevertheless also recognized that proofs of sufficient quality could be provided through 'circumstantial evidence "of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude."'" Ibid. (quoting Fleming, 164 N.J. at 101).

The cases discussed above only say that a jury cannot be asked to evaluate a mixed-motive claim as if it were a pretext claim. They do not hold that a plaintiff with both direct and circumstantial evidence must choose which one to present at trial. On the contrary, this court has recognized that a plaintiff may try a claim of unlawful employment discrimination under both the pretext and mixed-motive frameworks. Jackson, 296 N.J. Super. at 20 (citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1098 (3d Cir. 1995)). The trial court then decides, as a matter of law, "whether one or both theories properly apply" and charges the jury accordingly. Ibid. (quoting Starceski, 54 F.3d at 1098).

39

See also Barbera v. DiMartino, 305 N.J. Super. 617, 625-27 (App. Div. 1997) (no criticism of jury charge with both theories).

B.    The jury charge.

During the charge conference, the trial court ruled that it had to charge the jury on the mixed-motive theory because Lance's testimony that Davenport told him "he shouldn't basically go into the service, it would be bad for him" was direct evidence. It was direct evidence of hostility toward a member of a protected class. It was also evidence of a direct causal connection between the hostility and defendants' refusal to accept plaintiff's letter of intent, because the case law did not require the employer "to say something to the effect of I didn't hire him, I refused to hire him . . . because he's in the protected class." The court accordingly advised counsel that it would charge the jury in accordance with both the pretext and mixed-motive theories.

In giving the charge to the jury, the court avoided labeling any instruction as reflecting either theory. Instead, it related the terms "direct" and "circumstantial" to the evidence in the record and to what propositions each side needed to proffer or prove. The court began with a general statement of plaintiff's burden under either theory and defendants' burden under the mixed-motive theory:

To summarize, the plaintiff Ken Hagel, has alleged that Kevin Davenport, the current chief of the Sea Girt Police Department, discriminated against him in violation of the New Jersey Law Against Discrimination. Specifically, plaintiff contends that he was denied the opportunity to participate in the promotional process in 2014 and denied the promotion for sergeant in 2014 on the basis of his military service and his misperceived sexual orientation.

Plaintiff must prove that he was denied the sergeant promotion in 2014 because of his military service and/or misperceived sexual orientation.

Defendants must prove that even if his military status and/or misperceived sexual orientation had not been considered, he would have been denied the promotion.

The party with the burden of proof has the burden of proving his case by a preponderance of the evidence. And if the party fails to carry that burden, that party is not entitled to your favorable decision in this case.

The court explained that it would be "unlawful" if defendants "did, in fact, deny plaintiff the opportunity to participate in the promotional process and denied him the promotion to sergeant in 2014 because of plaintiff's military service and/or misperceived sexual orientation." It would not be unlawful if defendants had "denied plaintiff the opportunity to participate in the promotional process and denied him the promotion to sergeant in 2014 because of his failure

41

to timely turn in the notice to apply for sergeant and plaintiff's military service and/or misperceived sexual orientation was not a factor in that decision."

The court stated that plaintiff had the burden of proving that he was denied promotion "under circumstances that would give rise to an inference of discrimination." If plaintiff proved that by a preponderance of the evidence, the court told the jury that it "must consider whether the defendant engaged in intentional discrimination because of the plaintiff's [] military service and/or misperceived sexual orientation."

The court explained that that last proposition was "the ultimate issue [the jury] must decide," and it was "plaintiff's burden to prove" it. Plaintiff "may do this directly, by proving that a discriminatory reason more likely than not motivated the defendant['s] action, or indirectly, by proving that the employer's stated reason for its action is not the real reason for that action."

The court explained that plaintiff had to prove that "his military service and/or misperceived sexual orientation played a role in the decision and that it made an actual difference in the defendants' decision," but he did not need to prove that it was "the only reason or motivation for defendant[s'] actions." If plaintiff made that showing, the jury would be compelled to enter judgment for him. The court gave the next instruction, about judgment for defendants,

without mentioning a burden of proof or a required showing: "If, however, you find that the defendant would have made the same decision regardless of the plaintiff's military service and/or misperceived sexual orientation, then you must enter judgment for the defendant."

The court then gave instructions consistent with the pretext framework. It explained that, "[b]ecause direct proof of intentional discrimination is often not available, the plaintiff is allowed to prove discrimination by circumstantial evidence." Having already explained the difference between direct evidence and the inferential nature of circumstantial evidence, it instructed the jury "to evaluate all of the indirect evidence of discrimination that you find was presented during the trial." They "should consider whether the explanation given by the defendant for its actions was the real reason for its actions." If the jury found it was not, the jurors were to consider whether "the real reason is something other than illegal discrimination," and the court gave an illustrative scenario.

The court's final instruction on liability was that "plaintiff at all times bears the ultimate burden of convincing you that it is more likely than not that defendant[s] engaged in intentional discrimination." The "ultimate issue" was "whether the defendant engaged in discrimination regarding military service

and/or misperceived sexual orientation by denying plaintiff the opportunity to participate in the promotional process and to deny plaintiff the promotion for sergeant," and "plaintiff has the burden to prove the discrimination occurred."

The court read the verdict sheet questions on liability to the jury without elaboration. The first question, with four parts, asked if plaintiff had proved by a preponderance of the evidence that he was a member of a protected class, had applied for a position for which he was qualified, was "denied the promotion despite adequate qualifications," and "was not promoted under circumstances that would give rise to an inference of discrimination." If the answer to each part was "yes," the jury had to decide the second question, which was "Have [d]efendants proven that even if [p]laintiff's military service and/or misperceived sexual orientation had not been considered, he would not have been promoted in 2014."

C.   Analysis.

In Sisler, a rigorous application of the direct evidence requirement led the Court to hold that the respondent lacked direct evidence of discrimination. The bank chairman who hired the respondent in that case was later shocked to learn of his youthfulness, and he told the respondent that it "would be embarrassing" if others at the bank learned that he hired someone so young for such

responsibilities and at such a salary. 157 N.J. at 196-197. There were no complaints about the respondent's performance, but the chairman and the bank's president told the respondent that "they didn't think this was going to work" and they "wanted to make some changes." Id. at 197. They asked him to resign and "work for the bank in another capacity" such as consultant. He declined, the chairman and president terminated him because "it simply 'wasn't working out,'" and they replaced him with an older person. Ibid. The Court held that there was no direct evidence of "a causal link" between that antipathy and the decision to terminate the respondent because the evidence of "antipathy towards [the defendant's] youth does not give rise to any mandatory inferences of discrimination based upon age." Id.. at 217. The respondent had also sought to proceed under the pretext framework, and the court limited him to that. Ibid.

The Sisler analysis all but required proof of a blatantly discriminatory statement during the process of deciding to terminate the employee. Similarly, in McDevitt, 175 N.J. at 530-32, the Court explained that a "head nod" by a decisionmaker during the decisionmaking process in response to a statement directly reflecting discriminatory animus can be direct evidence of discrimination if it was an adoptive admission. However, in the more recent cases of Myers and Smith, this court and the Supreme Court found direct

45

evidence even in the absence of an unquestionable expression of discriminatory animus made during the decision process.

In Myers, a company official testified to her belief that the plaintiff worked less hard and was less productive than the employee who was retained. 380 N.J. Super. at 445, 450. The official knew about an impending reduction in force, and there was evidence that she was "instrumental" in the decision to downgrade the plaintiff's performance appraisal, as well as evidence that the downgrade was the only reason why the employer terminated the plaintiff instead of the other employee. Id. at 462-63. Although this court did not expressly call the decision to terminate inseparable from the decision to downgrade, or all but inseparable, we nonetheless found sufficient direct evidence of discrimination in the plaintiff's termination for a mixed-motive claim to proceed. Id. at 463.

The same is true of Smith, in which the executive director told the plaintiff that he anticipated the plaintiff would have an "ugly divorce," and that "if there had been even the slightest chance of reconciliation, [he] would not have to take the issue to" the board of directors. 225 N.J. at 380-81. The plaintiff was terminated at the next board meeting, for which the minutes recorded statements that the plaintiff had been performing very poorly and that remediation had

46

failed. Id. at 381. There was no evidence that the plaintiff's marital status had been referenced in the board's process of deciding to terminate, but the Court found the executive director's "facially discriminatory statements about divorcing persons" to be direct evidence of discrimination because they "clearly signaled that [the] plaintiff was fired because of the demise of his marriage." Id. at 398. The executive director's "reliance on stereotypes about the manner in which divorcing employees conduct themselves in the workplace" was further direct evidence that the animus motivated the termination. Id. at 398-99.

In this case, the catalog of statements, drawings, altered photos, and other items that disparaged plaintiff for his military service and for his misperceived sexual orientation, all of which were credibly attributed to Davenport, was direct evidence of Davenport's discriminatory animus against an officer's being in either of those protected classes. The question is whether plaintiff had evidence that showed a direct causal connection between that animus and the rejection of his letter of intent.

Sisler and McDevitt would require Davenport to have made a statement or engaged in conduct reflective of that animus at the moment that he rejected plaintiff's letter of intent, which would be barely distinguishable from an admission. By contrast, Myers and Smith only required a company official with

A-3652-19

the requisite discriminatory animus to have participated in the adverse decision. That may reflect the stronger expression of the animus in those cases, along with their being more recent than <u>Sisler</u> and <u>McDevitt</u>. The numerous and unmistakably hostile expressions of animus that Davenport admitted to making or which the jury reasonably attributed to him were not "stray remarks," because he was part of the decisionmaking process for the promotion. This, we conclude, amply justified the trial court's implicit application of the <u>Myers</u> and <u>Smith</u> perspective, particularly in light of the LAD's remedial purposes.

As for the jury charge itself, the first part was consistent with the tenets of proof by direct evidence, while the second was consistent with proof of a pretext by circumstantial evidence. The charge articulated each question on the verdict sheet in terms of the evidence and each side's factual allegations, and it related each question's function in substantiating or refuting plaintiff's and defendants' positions, in a way that kept the overall picture in clear view.

The verdict sheet was also clear. The first question on the sheet, in four subparts, addressed the elements of a pretext claim, and counsel made no objection as they discussed it during the charge conference with the understanding that was intended to cover the pretext claim. The attorneys did not even discuss the second question on the sheet. That one addressed

defendant's burden in refuting plaintiff's direct evidence of discrimination, which is the only question before the jury on any mixed-motive claim. Posing the questions on which only plaintiff had the burden of proof, followed by the question on which only defendants had that burden, was a discreet apposition of the pretext and the mixed-motive questions that adhered to the sequence the jury would expect of plaintiff-then-defendant, and it did so without mixing or conflating the pretext and mixed-motive theories.

Because we discern no error in the jury charge, we reject defendants' contentions on this point.

IV.

In denying defendants' motion for a new trial, the trial court held that plaintiff's evidence of harassment at trial was relevant to the question of "Davenport's discriminatory motivation" and "animus." It declared the absence of case law "that required exclusion of evidence that was part of a claim that was ultimately dismissed," and it cited Roa v. Roa, 200 N.J. 555 (2010), as allowing such evidence . See Roa, 200 N.J. at 576 ("Title VII does not bar [an] employee from raising prior time-barred claims as 'background evidence in support of a timely claim.'" (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002))).

On appeal, the Borough and Department claim that the court erred by admitting evidence about harassment because it was relevant only to the hostile work environment claim that had been dismissed on summary judgment. They argue that the incidents of harassment alleged in connection with hostile work environment were unrelated to the 2013 promotion process and were remote from the adverse action of declining to accept plaintiff's late submission of his letter of intent, so they could not have been a pretext for the failure to promote. For the reasons that follow, we conclude that the trial court properly admitted the harassment evidence at trial.

Relevant evidence is "evidence having a tendency in reason to prove or disprove" a material fact. N.J.R.E. 401. Relevant evidence is usually admissible unless some exception applies. N.J.R.E. 402. Evidence of a person's "character or character trait" is not admissible as proof that the person acted in conformity with it on a specific occasion, N.J.R.E. 404(a), but evidence of a person's "other crimes, wrongs, or acts" may be admitted "as proof of motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident." N.J.R.E. 404(b).

Appellate courts defer to the trial court's evidentiary rulings unless there was an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). "We will

not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). Accord Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). Even then, a mistaken evidentiary ruling will not lead to reversal unless it has "the clear capacity to cause an unjust result," Garcia, 245 N.J. at 430, which is the Rule 2:10-2 standard ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ."). These standards of review apply to rulings on the admissibility of evidence of other wrongful acts. State v. Weaver, 219 N.J. 131, 149 (2014) (other-crimes evidence).

In Rendine v. Pantzer, 276 N.J. Super. 398, 427-28 (App. Div. 1994), aff'd as modified on other grounds, 141 N.J. 92 (1995), this court admitted the plaintiff's evidence of discriminatory acts against other employees as evidence of the employer's wrongful motive in firing her. It cited Rule 404(b) and explained that "[m]ost federal courts which have considered the issue have concluded that evidence of other acts of discrimination is admissible to prove an employer's motive or intent to discriminate."

As our Supreme Court later observed, "[t]he general rule is that it is within the discretion of a court to allow evidence of prior acts relevant to show the motive, intent, or the plan of defendants in discrimination cases." Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 134 (1999) (citing Hogan v. Am. Tel. & Tel. Co., 812 F.2d 409, 410-11 (8th Cir.1987) ("Proffered evidence of past acts of racial discrimination may be relevant to prove the defendant's intent or motive in his actions towards the plaintiff.")). "Evidence of prior acts of discrimination is relevant to an employer's motive in discharging a plaintiff, even where this evidence is not extensive enough to establish discriminatory animus by itself." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (8th Cir. 1988).[3] Furthermore, "evidence that a decisionmaker tolerated a hostile environment can be relevant to the question of whether that decisionmaker later terminated an employee due to a discriminatory motive." Stewart v. Rise, Inc., 791 F.3d 849, 859 (8th Cir. 2015).

Even if the evidence relates to a claim that would be time-barred, "[i]t will be for the judge, as the gatekeeper, to determine whether the evidence of the

[3] Estes had been viewed as overruled or abrogated on other grounds by Price Waterhouse for being too permissive about the proof requirements in mixed-motive cases, until that ground in Price Waterhouse was itself overruled by 42 U.S.C. § 2000e-2(m) as noted above. See, e.g., Johnson v. United Cerebral Palsy/Spastic Children's Found., 93 Cal. Rptr. 3d 198, 216 (Ct. App. 2009).

untimely claims satisfies the N.J.R.E. 404(b) standard . . . ." <u>Roa</u>, 200 N.J. at 576. "[I]f the evidence is admitted, it will be for the jury to decide" its value as proof of motive. <u>Ibid.</u>

Plaintiff's promotion to sergeant would have increased his responsibilities, and potentially increased defendants' inconvenience in accommodating his military service, which the evidence showed Davenport already resented. As discussed in Section III of this opinion, the harassment by which Davenport expressed his resentment had direct bearing on the questions of whether he had a motive and intent to deny plaintiff an opportunity to compete for the promotion.

Under these circumstances, we are satisfied that the trial court did not abuse its discretion by admitting the harassment evidence for its relevance to plaintiff's claim of failure to promote. In addition, the jury charge repeatedly emphasized that failure to promote was the only claim in the case, and that the evidence of harassment was to be considered only for its relevance in establishing that the failure to promote was motivated by discrimination.

V.

The Borough and the Department assert that the jury's verdict that plaintiff applied for the sergeant promotion was against the weight of the evidence

because plaintiff admitted he missed the application deadline by one day. Again, we disagree.

The trial court charged the jury that "plaintiff contends that he was denied the opportunity to participate in the promotional process," while defendants maintain that they denied him "the opportunity to participate in the promotional process . . . because of [his] failure to timely turn in his notice to apply." The court told the jury that plaintiff therefore had the burden of proving that he had "applied for a position for which he was qualified." The court stated that the "ultimate issue you must decide" was "did the defendants deny plaintiff the opportunity to participate in the promotional process" and deny him the promotion "because of his military service and/or misperceived sexual orientation."

The verdict sheet asked whether "Plaintiff applied for a position for which he was qualified," and the court read that language to the jury with no elaboration other than to "answer yes or no." The jury unanimously voted yes.

In denying defendants' new trial motion, the court explained that the "failure to formally apply for a job opening [will] not bar a plaintiff from establishing a prima facie case of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer"

(quoting EEOC, 892 F.2d at 348). In the alternative, "a plaintiff need not formally apply, "if he was deterred from applying [due to the employer's] discriminatory practices, or had a real, and genuine interest in [the job] but reasonably believed that a formal application would be futile" (quoting Newark Branch, 907 F.2d at 1415).

In its ruling, the trial court found that plaintiff presented sufficient evidence of his intent to participate in the 2013 promotion process. It found the absence of a dispute that plaintiff "was interested in the promotion," that he attempted to submit the notice of intent after the deadline, and that "he was not permitted to file a late submission and/or [there] was not enough time for Davenport to order certain paperwork." The court concluded that plaintiff "was at the very least being deterred, if not actually denied, the opportunity to formally apply."

A trial court "shall grant" a motion for new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or

when the case culminates in 'a clearly unjust result.'" Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521-22 (2011)).

The standard of review on appeal "is the same as that governing the trial judge—whether there was a miscarriage of justice under the law." Ibid. (quoting Risko, 206 N.J. at 522. Rule 2:10-1 specifies that "miscarriage of justice under the law" is the standard when the issue in the motion for new trial was "whether a jury verdict was against the weight of the evidence." "[A] jury verdict, from the weight of evidence standpoint, is impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice." Carrino v. Novotny, 78 N.J. 355, 360 (1979) (citing Baxter v. Fairmont Food Co., 74 N.J. 588 (1977)).

In this case, the trial court did not expressly tell the jury that plaintiff could be credited with applying for the promotion if he had made reasonable efforts that were discouraged or thwarted. However, the jury charge plainly implied that proposition, the jury necessarily made such an inference in returning a verdict for plaintiff, the inference was permissible under EEOC, Newark Branch, and Teamsters as discussed in Section II of this opinion, and it

was supported by the record.  There was accordingly no miscarriage of justice under the law.

VI.

We now turn to the Borough and Department's arguments about damages. Defendants argue that the trial court erred by failing to order a new trial on the grounds that the compensatory and punitive damages awards were miscarriages of justice.  They assert that the award for emotional distress was greatly disproportionate because the jury based it on plaintiff's entire police career rather than just on the distress that he could have experienced from Davenport's telling him that his untimely letter of intent could not be accepted.  The Borough and Department argue further that the evidence did not support any award of punitive damages.  These contentions lack merit.

A.    Compensatory damages for emotional distress.

"[T]he trial court may not disturb a damages award entered by a jury unless it is so grossly excessive or so grossly inadequate 'that it shocks the judicial conscience.'"  Orientale v. Jennings, 239 N.J. 569, 595 (2019) (quoting Cuevas v. Wentworth Grp., 226 N.J. 480, 485 (2016)).  The trial record must "be viewed in the light most favorable to plaintiffs."  Cuevas, 226 N.J. at 488.

However, when a damages award "is so grossly excessive or so grossly inadequate" as to require a new trial, the court "also has the option of recommending to the parties a remittitur or an additur in lieu of a new trial." Orientale, 239 N.J. at 595-96. "In setting a remittitur or an additur, the court must determine 'the amount that a reasonable jury, properly instructed, would have awarded.'" Orientale, 239 N.J. at 596 (quoting Tronolone v. Palmer, 224 N.J. Super. 92, 103 (App. Div. 1988)).

Just as for the decision to grant a new trial on damages, a trial court "must exercise the power of remittitur with great restraint" and only "in the unusual case in which the jury's award is so patently excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience." Cuevas, 226 N.J. at 485. "[A] judge's personal experiences with seemingly similar cases while in practice and on the bench are not relevant in deciding a remittitur motion." Id. at 505.

"The standard for reviewing a damages award that is claimed to be excessive is the same for trial and appellate courts, with one exception—an appellate court must pay some deference to a trial judge's 'feel of the case.'" Id. at 501 (quoting Johnson v. Scaccetti, 192 N.J. 256, 282 (2007)). If the trial court grants remittitur, the appellate court likewise "reviews [the] grant of remittitur

de novo, but defers to a trial court's 'feel of the case.'" Graphnet, Inc. v. Retarus, Inc., 250 N.J. 24, 36 (2022) (quoting Cuevas, 226 N.J. at 505).

"'[T]he Legislature intended victims of discrimination to obtain redress for mental anguish [and] embarrassment,' even when their emotional and physical ailments cannot be characterized as severe." Cuevas, 226 N.J. at 511 (second alteration in original) (quoting Tarr v. Ciasulli, 181 N.J. 70, 82 (2004)). "Because of the special harm caused by willful discrimination in the workplace, 'compensatory damages for emotional distress, including humiliation and indignity[,] are remedies that require a far less stringent standard of proof than that required for a tort-based emotional distress cause of action.'" Ibid. (quoting Tarr, 181 N.J. at 82).

"Emotional-distress damages are not presumed; they must be proved" by demonstrating "a causal connection between the constitutional violation and the emotional distress." Besler v. Bd. of Educ. of W. Windsor-Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 576 (2010). However, and "[s]pecifically, in a LAD case, a plaintiff is not required to provide 'expert testimony or independent corroborative evidence . . . to support [an] award of emotional distress damages.'" Cuevas, 226 N.J. at 511 (omission and alteration in original) (quoting Tarr, 181 N.J. at 79). That is for past distress, sustained up to and

59

through trial; expert testimony is needed only for "emotional distress damages projected into the future." Id. at 512 (citing Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 554 (2013)).

### 1.   The jury charge and the trial court's post-trial rulings.

The court charged the jury that, if the jurors found for plaintiff "on past emotional distress," he would be "entitled to recover fair and reasonable money damages for the full extent of the harm caused" in light of "all the circumstances of the case." The compensable harm was "any emotional distress he has suffered that was the proximate result of the defendant[s'] wrongful conduct," and the time period was "from the date of the defendant's unlawful conduct through the date of your verdict." The jury was to consider "the nature, character, and seriousness of any emotional distress and [its] duration."

The verdict sheet placed the caption "Past Emotional Distress Damages" before the questions on liability and amount. The jury voted unanimously for plaintiff on the question of whether he had proved "that he is entitled to an award for emotional distress damages arising from his not being promoted in 2014," and it awarded him $500,000.

The court treated defendants' post-trial motion on the ground of excess emotional distress damages as a motion for new trial or remittitur. It noted

defendants' argument that the award "was unduly influenced by the alleged harassment," as well as plaintiff's argument

> that his testimony made clear that it changed his outlook, and attitude regarding his long career, that he felt frustration, that he experienced constant and intense fear by intentionally being "jammed up" by Davenport with false disciplinary charges. That he experienced physical and mental pain. And that the conduct affected him and his family life.

The court found that "those feelings fall squarely within the model jury charge" that it used to instruct the jury. It denied a new trial or remittitur because the award was within the "wide spectrum of acceptable outcomes" and was not a shock to the judicial conscience.

2.    Analysis.

Plaintiff's testimony about his emotional distress was adequate proof of its connection to defendants' wrongful conduct. Plaintiff described his emotional distress, which included physical manifestations, from Davenport's harassment, and from the feelings engendered by both the harassment and the denial of the promotion that he would never have an opportunity to perform to his ability.

Mindful of our standard of review, we conclude that the jury was within its discretion in determining $500,000 to be an appropriate award for a

promotion that could have been the highlight of plaintiff's career in the Department, but was instead denied as the culmination of the history of denigrating plaintiff for his military service and misperceived sexual orientation. The record supported that perspective, and the $500,000 award does not shock the judicial conscience in light of the distress that plaintiff described and related to those circumstances. The jury was not bound to accept defendants' view that plaintiff necessarily experienced the sting of each prior incident of harassment as time-limited, disaggregated, and compartmentalized and therefore incapable of being revived and increasing his distress over being wrongfully denied promotion for the same discriminatory reasons.

Defendants' two case law examples in support of its contentions to the contrary are inapposite. In the first, the award in question was not for emotional distress on an LAD claim for discriminatory failure to promote, but rather the award for economic damages on a Conscientious Employee Protection Act claim for retaliatory failure to promote. Royster v. N.J. State Police, 439 N.J. Super. 554, 579-80 (App. Div. 2015), aff'd as modified on other grounds, 227 N.J. 482 (2017). The plaintiff named many promotions given to other employees, but some of them were outside of the statutory limitation period, which the plaintiff acknowledged by limiting his economic damage claims to the promotions that

were denied within the limitation period. Ibid. The jury instead calculated economic damages on all the promotions, which was patent because they "awarded more money in each category of economic damages than [the] plaintiff requested." Ibid.

Royster could hardly be more different from this case because the economic damages there were calculated with respect to the plaintiff's salary within the limitation, whereas our courts have recognized that emotional distress damages are inherently subjective and not amenable to formula. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 613 (1993) ("the subjective reaction of the plaintiff and her individual injuries remain relevant to compensatory damages.").

In defendants' second example, the plaintiff claimed under the LAD that ten failures to promote had been discriminatory, but the jury found that only one had been. Grasso, 364 N.J. Super. at 120. The verdict sheet required the jury to determine which of the failures to promote were discriminatory, but then it asked the jury to award "emotional distress damages [the plaintiff] sustained as a proximate result of the conduct of the defendants." Id. at 117. However, this court called the plaintiff's testimony about her emotional distress "all inclusive," and it noted the absence of expert testimony about the distress caused by each

failure to promote. Id. at 120. Even if the jury understood the implicit limitation to just the one failure to promote that involved discrimination, "the jury had no way to separate the emotional effect on [the] plaintiff of this one rejection from the nine others." Ibid. The trial court found that the award was excessive because, in its words, the plaintiff's emotional distress "was not ever specifically connected to this position." Ibid. It granted remittitur and reduced the award by ninety percent, and this court agreed that the evidence could not support a higher award. Ibid.

Again, that was not the situation here. Plaintiff explained that his emotional distress related to the discriminatory denial of the opportunity to participate in the 2013 promotion process. Defendants have no basis for their speculation that the jury somehow based part of the award on the history of discriminatory conduct standing alone, instead of appropriately considering that history for its contribution to plaintiff's distress over being denied the promotion. Therefore, we reject defendants' contentions concerning this category of damages.

B.    Punitive damages for failure to promote.

The purpose of punitive damages is "the deterrence of egregious misconduct and the punishment of the offender." Quinlan v. Curtiss-Wright

Corp., 204 N.J. 239, 273-74 (2010) (quoting Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 337 (1993)). The New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17 (the Act), was enacted in 1995 to "establish more restrictive standards with regard to the awarding of punitive damages." Pavlova v. Mint Mgmt. Corp., 375 N.J. Super. 397, 403 (App. Div. 2005). Accord Pritchett v. State, 248 N.J. 85, 108 n.4 (2021).

The Act permits recovery of punitive damages

> only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.
>
> [N.J.S.A. 2A:15-5.12(a).]

Liability under the Act is reserved for intentional wrongdoing that is "especially egregious." Quinlan, 204 N.J. at 274 (quoting Rendine v. Pantzer, 141 N.J. 292, 313 (1995)). It requires "intentional wrongdoing in the sense of an 'evil-minded act,' or an act accompanied by a wanton and wilful disregard of the rights of another." Smith v. Whitaker, 160 N.J. 221, 241 (1999) (quoting Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984)). It also requires proof of "actual malice," Quinlan, 204 N.J. at 274, which may be the

same type of fraudulent motive, or deliberate act or omission with knowledge of the likely harmful consequences, that a jury would need in order to find tortious interference or fraud. See Nappe, 97 N.J. at 48-51.

For a public entity to be liable for punitive damages on an LAD claim, the plaintiff must also prove "actual participation in or willful indifference to the wrongful conduct on the part of upper management." Baker v. Nat'l State Bank, 161 N.J. 220, 223 (1999) (quoting Rendine, 141 N.J. at 314). Determining whether an employee is a member of upper management "requires a fact-sensitive inquiry that depends not on labels or titles but on whether an employee possesses "'significant power, discretion and influence . . . ' [and is] capable of furthering the mission of the organization and of selecting courses of action from available alternatives." Lockley v. State, Dep't of Corr., 177 N.J. 413, 424 (2003) (omission in original) (quoting Cavuoti, 161 N.J. at 123).

Determining whether an employee "possesses this level of authority may generally be determined by focusing on the interplay of three factors: (1) the relative position of that employee in his employer's hierarchy; (2) his function and responsibilities; and (3) the extent of discretion he exercises." Cavuoti, 161 N.J. at 123 (quoting N.J. Tpk. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 73, 150 N.J. 331, 356 (1997)). For that purpose, upper management

66

includes "those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers)." Id. at 128-29. For an employee "on the second tier of management," such authority is shown by having "either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace." Id. at 129.

If the jury decides to award punitive damages, it must determine what amount to award. N.J.S.A. 2A:15-5.12(c). It is to consider "all relevant evidence," except that for awards against a public entity, it may not consider evidence "relating to the financial condition of the defendant." Lockley, 177 N.J. at 431-32.

The Act "envisions an active role for the trial court in reviewing the jury's determinations." Pritchett, 248 N.J. at 109. The court is to review both the jury's decision to impose punitive damages and the amount the jury awarded for their reasonableness in the particular case, and to reduce or vacate the award if "necessary":

> Before entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct. If necessary to satisfy the requirements of this section, the judge may reduce the amount of or eliminate the award of punitive damages.
>
> [N.J.S.A. 2A:15-5.14(a).]

The trial judge "should also consider the award in light of the civil penalties authorized by the statute or imposed in comparable cases." Lockley, 177 N.J. at 432. Lockley cited the LAD's schedule of penalties, which are imposed in addition to compensatory damages and "range[] in value from $10,000 to $50,000, depending upon the frequency of the offense within specified time frames." 177 N.J. at 432 (citing N.J.S.A. 10:5-14.1a). It cited them notwithstanding that Lockley was a private action and the LAD's statutory penalties are unavailable "within the context of a civil proceeding," Maczik v. Gilford Park Yacht Club, 271 N.J. Super. 439, 453 (App. Div. 1994), meaning one not instituted by the Attorney General or the Director of the Division on Civil Rights. See N.J.S.A. 10:5-14.1a (flush language).

The penalty provisions that may be considered, even if not directly applicable to an LAD claim, include the Act's cap on punitive damages.[4] Pritchett, 248 N.J. at 113. The United States Supreme Court has discussed "a single-digit ratio between punitive and compensatory damages" as nearly presumptive, State Farm Mut. Auto. Ins. Co v. Campbell, 538 U.S. 408, 424-26 (2003), and our Court saw the Legislature's exemption of LAD claims from the statutory cap on punitive damages as reflecting the same view "that sole reliance on such ratios and caps is impermissible." Pritchett, 248 N.J. at 113. Pritchett conspicuously declined to exclude "such ratios and caps" from the "holistic assessment of the Baker/BMW[5] factors" that it required in lieu of declaring any particular cap. Ibid. (emphasis in original).

---

[4] The Act has a cap on punitive damages, N.J.S.A. 2A:15-5.14(b), but LAD claims are expressly exempted. N.J.S.A. 2A:15-5.14(c); Baker, 161 N.J. at 231 (accommodating the exemption). The cap for each defendant is the greater of five times its liability for compensatory damages or $350,000. N.J.S.A. 2A:15-5.14(b). "Compensatory damages" is defined as "damages intended to make good the loss of an injured party, and no more." N.J.S.A. 2A:15-5.10. That term "includes general and special damages" while expressly excluding only "nominal, exemplary or punitive damages." Ibid.

[5] BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996). The exact tenets of BMW, as quoted by Baker v. National State Bank, 353 N.J. Super. 145, 152 (App. Div. 2002), are set forth below.

The decision to award or deny punitive damages "rests within the sound discretion of the trial court." Maudsley v. State, 357 N.J. Super. 560, 590 (App. Div. 2003). Accord Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 432 (1994) (citing Leimgruber v. Claridge Assocs. Ltd., 73 N.J. 450, 456 (1977)).

The trial court's decision about the amount of the award is similarly reviewed for an abuse of discretion. Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 565 (App. Div. 2007) (decision not to reduce award pursuant to N.J.S.A. 2A:15-5.14(a) was "not an abuse of discretion"), aff'd, 194 N.J. 212 (2008). "An otherwise valid award of punitive damages will not be set aside unless 'manifestly outrageous,' or 'clearly excessive.'" Smith, 160 N.J. at 242 (first quoting Allen v. Craig, 13 N.J.L. 294, 302 (Sup. Ct. 1833); and then quoting Leimgruber, 73 N.J. at 453).

Adherence to that standard reflects the general deference paid to a trial court's factfinding. See Cooper Indus., Inc. v. Leatherman Tool Grp. Inc., 532 U.S. 424, 440 n.14 (2001) (even in de novo review of the amount of a punitive damages award for unconstitutional excessiveness pursuant to BMW, "it of course remains true that the Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous."). Accord Baker, 353 N.J.

Super. at 145 (quoting <u>Cooper</u>, 532 U.S. at 440 n.14) (applying de novo standard only to unconstitutional excessiveness).[6] Appellate review of a decision to grant or deny remittitur of a punitive damages award requires "due deference to the trial judge's 'feel of the case.'" <u>Baker</u>, 353 N.J. Super. at 169 (quoting <u>Baxter v. Fairmont Food Co.</u>, 74 N.J. 588, 600 (1977)).

However, on the specific question of whether a punitive damages award is "so excessive as to violate substantive due process," which is the question that <u>BMW</u> was the first case to identify, the standard of review is de novo. <u>Id.</u> at 152. Due process requires such review regardless of whether the defendant is a private or public entity, notwithstanding that constitutional standards of due process are implicated only for private entities because states and their agencies

---

[6] The Borough and Department cite <u>Rusak v. Ryan Automotive, LLC</u>, 418 N.J. Super. 107, 118 (App. Div. 2011), for the proposition that there is a de novo standard of review for all aspects of punitive damages. We disagree with defendants' interpretation of this case. Defendants are correct that <u>Rusak</u>, <u>ibid.</u>, cited <u>Baker</u> when it stated simply that "[o]ur review of a trial court's ruling on punitive damages is de novo," without noting <u>Baker</u>'s application of that standard only to the unconstitutionality analysis. That imprecision in <u>Rusak</u> is understandable because <u>Rusak</u> was not addressing the amount of a punitive damages award, but rather the denial of reconsideration by the trial court of its "refusal to submit" the punitive damages claim to the jury. <u>Id.</u> at 118-22. In reversing the denial of reconsideration, this court relied on the lack of a proper jury charge on punitive damages, the confusing verdict sheet interrogatories, and the trial court's unconvincing interpretation of the jury's answers and application of them to the standard for letting the question of punitive damages go to a jury. <u>Ibid.</u> Therefore, we reject defendants' interpretation of <u>Rusak</u>.

are not "persons" for purposes of the due process clause in the Fifth and Fourteenth Amendments. Lockley, 177 N.J. at 432-33 (citing Bain v. City of Springfield, 678 N.E.2d 155, 162-63 (Mass 1997)).

In evaluating the constitutionality of the amount of the award, a reviewing court "must consider" BMW's three factors:

> the degree of reprehensibility of the conduct that formed the basis of the civil suit; the disparity between the harm or potential harm suffered by the injured party who was the plaintiff in the civil case and the plaintiff's punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases.
>
> [Baker, 161 N.J. at 230 (quoting BMW, 532 U.S. at 575).]

The reviewing court applies both the BMW factors and the Act "to ensure that any award of punitive damages bears 'some reasonable relation' to the injury inflicted." Id. at 231. If the defendant is a public entity, the reviewing court has a "heightened" responsibility to ensure reasonableness, because "when public monies are the source of the award, the judge must scrutinize with great care the amount of the award to determine whether it is proportionate to the harm suffered by the plaintiff." Lockley, 177 N.J. at 433.

1.    The jury charge and post-trial ruling.

The trial court explained to the jury that, while the purpose of compensatory damages was to compensate plaintiff for his "actual injury or loss" from defendants' "wrongdoing," the purpose of punitive damages was "to punish a wrongdoer and to deter the wrongdoer from similar wrongful conduct in the future." Punitive damages are not "a routine matter," as they are "to be awarded only in exceptional cases, to punish a party who has acted in an especially egregious or outrageous manner and to discourage that party from engaging in similar discriminatory conduct in the future."

More specifically, the court stated that plaintiff was required to have proved by clear and convincing evidence that his "injury, loss, or harm . . . was the result of [] Davenport and/or the [B]orough's acts or omissions," and that the conduct was "malicious" or reflected "wanton and willful disregard of [his] rights." In accordance with N.J.S.A. 2A:15-5.12(b), the court instructed the jury to "consider all relevant evidence" including the likelihood of serious harm from defendants' conduct, defendants' awareness of that likelihood, "[t]he duration of the conduct or any concealment of it," and the "profitability, if any, of the discriminatory conduct to the [B]orough."

The court further instructed that an award of punitive damages required them to find that "the discrimination was especially egregious," and that at least

one of the Borough's "upper management employees actually participated in, or was willfully indifferent to, the wrongful conduct."  "Egregious" meant motivated by malice or done with "a willful and wanton disregard"; "malice," in turn, meant that "Davenport engaged in intentional wrongdoing in the sense of an evil-minded act designed, intended and done specifically to injure the plaintiff," while "willful and wanton disregard" meant that "Davenport deliberately acted with knowledge of a high degree of probability of harm to the plaintiff, and reckless indifference[] to the consequences of that act."

For upper management, the court explained that it included not just the "highest-level executive officers," but also "those employees to whom a corporation has delegated responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit."  One example was "heads of departments."  Not all managerial employers were part of upper-level management, and for "an employee on the second tier of management" to qualify, the jury had to find that the employee had "either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote and discipline, or (2) the delegated responsibility to execute the employer's policies  to ensure a safe, productive and discrimination-free workplace." The court also stated that "[i]f the upper-level employee were

A-3652-19

someone other than Davenport, that employee must have "either actively participated in the wrongful conduct or [been] willfully indifferent to it."

The court further charged the jury that the amount of a punitive damages award "must be based on your sound judgment as to what is fair and reasonable under all of the circumstances," and that it "must bear some reasonable relationship to the actual injury inflicted and the cause of the injury." The jury was to consider "all relevant evidence surrounding the wrongful conduct," including the likelihood of serious harm from the conduct and the Borough's awareness of such likelihood.

The verdict sheet had two questions on liability, and the jury unanimously answered yes to both. The questions were whether plaintiff proved by clear and convincing evidence that: (1) "Defendants Borough of Sea Girt's and Kevin Davenport's conduct was especially egregious, that it was motivated either by actual malice or was done with a willful and wanton disregard of the rights of Plaintiff," and (2) "at least one member of upper management of Defendant Borough of Sea Girt actually participated in the conduct set forth in" the first question. By a vote of five to one, the jury awarded plaintiff $1 million.

The court denied the Borough's and the Department's motion for a new trial or remittitur on punitive damages. It relied on its disinclination to vacate

the jury's finding that there was clear and convincing evidence of "especially egregious conduct," and it cited <u>Roa</u> again when it found an absence of case law to validate defendants' argument that the evidence for an award of punitive damages "must be limited to only facts surrounding [the] surviving claims, not facts [supporting claims] that have been dismissed."

As for the reasonableness of the amount of the award, the court related at length the case law discussed above in explaining its reduction of the $1 million punitive damages award to $750,000. It rejected defendants' argument "that the discrimination arises out of a single act . . . of not accepting [a] notice of intent outside the time limit," on the ground that it would "improperly dilute, or downplay the conduct in the case, which the jury found to be egregious." However, the court partially disagreed with plaintiff by finding that "many" of the acts or incidents that he and Lance described were "not necessarily discriminatory," and it noted the uncertainty about "which specific acts" the jury found to be discriminatory.  Regardless of the number of discriminatory acts, the statutory penalty if applicable could not have exceeded $50,000.

The court made several observations about how the discrimination did not injure plaintiff as severely as it might have.  None of the wrongful conduct caused "documented physical injuries" or "manifestations."  The court stated

that it could not "ignore that plaintiff sought no treatment for any psychological effects of the discrimination, because of the emotional distress, and was well compensated for that emotional distress in the amount of $500,000." Plaintiff did not miss any work due to his emotional distress; "[a]lthough he understandably may have dreaded going to work, that feeling could arise in any employment setting." Finally, the court observed that plaintiff was "well compensated" for his lost wages and "made whole" by the awards for back pay and front pay, with the latter arguably representing a "double recovery" given that plaintiff was still working after he left the Department, which was not the same as being "left unemployed with no possibility of gainful employment."

For "proportionality," the court noted that the $1 million award exceeded the total compensatory damages award and far exceeded the maximum that could be imposed as civil penalties. It found the award to be "unreasonably skewed or disproportionate" based on its factual observations and on the sufficiency of the compensatory damages awards. Based upon all of these considerations, the trial court determined that a reduction in the punitive damages award to $750,000 would "not reduce the verdict's impact in terms of deterring statutorily prohibited behavior," or reduce the impression it would make in the public realm.

## 2.    Analysis.

We are satisfied that the jury charge on punitive damages adhered to the case law requirements.  The record also supported the trial court's discretionary decision that there was sufficient evidence of "especially egregious" behavior with actual malice or willful and wanton disregard by a member of upper management for the question of punitive damages to go to the jury.

The punitive damages charge did not reference particular conduct by defendants.  As with the charge on emotional distress, it allowed the jury to infer that the harassment intensified the distress of the discriminatory denial of promotion.  That was appropriate under <u>Roa</u>, which allowed such use of evidence of harassment that would be time-barred if proffered solely to support a claim of hostile work environment, as discussed in Section IV.  The court's one passing reference to "profitability" was supported by the testimony that discrimination against plaintiff for his military service would discourage other officers from joining a military reserve and imposing additional scheduling difficulties on the Department.  Therefore, it was not an unjustified reference to the Borough's ability to pay the award, which would be inappropriate for a claim of punitive damages against a public entity.  <u>Lockley</u>, 177 N.J. at 432 n.2.

Defendants emphasize that Davenport was a sergeant when most of the harassment of plaintiff occurred, and that he was not promoted to acting captain until shortly before the 2013 promotion process. However, the jury could have found that Davenport was part of upper management since 2007, when his promotion to sergeant made him responsible for scheduling all officers in the Department, giving him power over who worked how many hours and at what times.

Even if the jury did not take that view, it still could have found that Davenport was upper management in 2013 as captain and acting chief, with influence that all but amounted to the power to grant or deny promotions. See Cavuoti, 161 N.J. at 129 (jury instructions regarding second-tier management employees "should be tailored to the facts of the case"). Davenport unilaterally rewrote the promotion procedures to increase the captain's or acting captain's influence, by adding his recommendation as a substantial factor and by eliminating the objective tests, and there was no evidence to compel a view that the Borough's participation in the process was more substantial than perfunctory.

The court remitted the punitive damages award to $750,000, which was one and one-half times the emotional distress award but slightly less than the total compensatory damages awards. That is far less than the cap of five times

the liability for compensatory damages that would apply if the Act did not exempt LAD claims, or the "single-digit ratio" discussed in State Farm and Pritchett that would presumably allow punitive damages awards up to ten times greater than the compensatory damages award, see Bell v. O'Reilly Auto Enters., LLC, 626 F. Supp. 3d 141, 182 (D. Me. 2022), so it was very far from being unconstitutionally excessive.

Accordingly, we reject defendants' arguments on this point. Neither the emotional damages award nor the remitted punitive damages award was a miscarriage of justice for being excessive.

VII.

The Borough and Department claim that the compensatory damages award for front pay was against the weight of the evidence. They argue that front pay was awardable only upon proof that the employee would have received the promotion in question, and there was no evidence here that plaintiff would have been selected over other applicants if he had been allowed to apply. This contention lacks merit.

"Front pay" means "future lost wages," Cavuoti, 161 N.J. at 135, and it begins to accrue "after a jury's verdict." Donelson v. DuPont Chambers Works, 206 N.J. 243, 251 n.9 (2011). "Its award 'is discretionary with the trial court,'"

ibid. (quoting Dillon v. Coles, 746 F.2d 998, 1006 (3d Cir. 1984)), meaning that the question "is to be decided by a jury [and] not a judge." Ibid. (quoting Cavuoti, 161 N.J. at 135). Even if a plaintiff proves that the failure to promote reflected unlawful discrimination and merited an award of back pay, front pay cannot be awarded if the plaintiff is unable to show that "promotion was probable or even reasonably likely absent discrimination." Grasso, 364 N.J. Super. at 127.

Our review of the record supports the jury's inference that plaintiff's promotion to sergeant was reasonably likely in the absence of discrimination. There was no evidence that Macko or any other officer was seen as a stronger candidate. Plaintiff had the most seniority, and there was scant evidence of dissatisfaction with his work or work ethic, or about his relationship with other officers, other municipal employees, and the public. In addition, there was no evidence compelling the jury to conclude that plaintiff would have repeated whatever shortcomings in the interview portions of the 2006-2007 promotion process caused him to tie for second place with O'Connor and lose the second sergeant position because O'Connor had more seniority. Therefore, the front pay award was not against the weight of the evidence.

A-3652-19

## VIII.

The Borough and the Department next argue that the "combined effect of [the] multiple errors" the trial court made required a new trial.  Having rejected defendants' contention that any reversible error occurred during the trial court proceedings, we also reject their cumulative error argument.

## IX.

Finally, the Borough and Department claim that prejudicial comments by plaintiff's counsel in summation in the compensatory damages phase warranted a new trial.  They cite appeals for the jury to favor plaintiff as if he were a family member, which they call a version of the prohibited "golden rule" invocation for the jury to award plaintiff what they themselves would wish to be awarded. They also cite what they call repeated disingenuous references by plaintiff's counsel to $10 million as the amount that counsel professed not to be requesting for emotional distress, and they argue that the references violated the prohibition against naming a specific dollar amount, or even an approximate one.

Defendants acknowledge that their objections prompted the court to give cautionary instructions, but they recite the amounts of the awards for emotional distress and for punitive damages without elaboration, as if the size of the awards standing alone proves that the instructions were ineffective.  They did

82

not object to plaintiff's summation on punitive damages and they do not assert the lack of opportunity to object. For the reasons that follow, we conclude that defendants' contentions lack merit.

"The trial court has broad discretion in the conduct of the trial, including the scope of counsel's summation." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 392 (2009). The standard of review for rulings concerning a summation is accordingly abuse of discretion. Id. at 392-93. We use the abuse of discretion standard when reviewing a trial judge's judgment about whether a summation comment was too prejudicial to be mitigated by a curative instruction. Bender v. Adelson, 187 N.J. 411, 435 (2006).

A.    The summations, objections, curative instructions, and new trial ruling.

During his summation, plaintiff's counsel told the jury that "[e]veryone is protected" under the LAD, and that meant the LAD also "applies to a white heterosexual male":

> So, as you go through—as we go through the things that were said and done about Ken, you are allowed to use your common sense to say, would I feel any differently about those comments if it was made to my daughter at work, or if it was made to my son at work. Or if it was made to an African-American male. If derogatory discriminatory statements are made it's the same whether you're a white heterosexual married guy or you're an unemployed African-American, or

you're a married gay person.  Everyone is protected.
That's the way it goes.

Later, after reviewing the acts of harassment and Lance's testimony, counsel addressed discrimination as the result of multiple acts of harassment, and he asked the jury to use a close family member to help them picture the connection between harassment and discrimination:

> You—and you ask yourself whether or not, if this was about your son or your husband or your brother or your sister, this kind of thing, whether or not this alone would be sufficient to establish discrimination.  It does not have to be 75 acts of discrimination, it can be one really bad one.  Well, guess what?  We have more than one.

In responding to defense summation comments that plaintiff was a liar, plaintiff's counsel argued that "if anyone has got the motivation to come in here and lie," it was Davenport, because "he knows that if he opens up the floodgates at all [by admitting] one" act of harassment, his calling plaintiff's military obligation a "pain in the ass" for scheduling, "he's going to have to start admitting the other ones" he could not afford to admit.  "Davenport has to perjure himself or he's going to lose the job.  Because there is no way that he could admit this stuff and still be a chief of police in Sea Girt or anywhere else."  By

contrast, plaintiff's attorney told the jury that plaintiff was not seeking the kind of windfall that could inspire perjury.

In his discussion of economic damages, plaintiff's counsel explained that the maximum award would be the difference between plaintiff's salary and a sergeant's salary until retirement. The difference in "lost annual salary was $9,000. Okay? Not $900,000. Right? Not $9 million dollars. $9,000." The award would not be higher than about $160,000, of which plaintiff would keep "under $100,000" after taxes, which meant that "[n]o one is asking for $10 million dollars."

The last reference by plaintiff's counsel to $10 million came in the context of emotional distress. At the end of his summation, after referencing each act of harassment, he argued that plaintiff was not seeking a large award but deserved "something":

> And emotional distress is what flows from those acts. It is more than reasonable in this case that—that—that you award Ken some damages for emotional distress. Nobody is saying—you'll see it on the sheet. Nobody is saying that it's $10 million dollars of emotional distress damages. It's never been that kind of case. But it's something that Ken should get for having been subjected to this sort of treatment by Davenport from '07 up to 2013.

A-3652-19

After summations, the Borough and Department objected to those comments.

Early in the jury charge, the court noted that each counsel in opening argument and summation gave "their views on what they think the evidence shows and the arguments in favor of their respective clients' positions." It instructed the jury that, "[w]hile you may consider their comments, nothing that the attorneys say is evidence and their comments are not binding upon you." For emotional distress, the court instructed the jurors to use their "reason and sound judgment, without any passion, prejudice, bias, or sympathy," to award an amount that is "fair, just and reasonable under all of the circumstances" in order "to make plaintiff whole, so far as money can do." The court then discharged the jury for the day.

The next morning, the court gave the jury curative instructions on the references by plaintiff's counsel to family members, and to the figure of $10 million:

> To the extent that anything has been personalized, in terms of asking you how would you feel if this was a family member, you shouldn't be personalizing the case. You shouldn't be having any extraneous references or drawing from how would you feel.

> While you do draw from your common sense regarding certain things, how you feel in terms of a bias, prejudice, should not come into this in any way.
>
> As to the extent there was any reference to—in the context of emotional distress damages—that $10 million dollars was—it was not being requested in this case, you should disregard the reference to any numerical amount in that context of emotional distress. Because it's your job to decide what the damages should be.

Defense counsel accepted those instructions without objection.

In denying defendants' motion for new trial based on plaintiff's summation, the trial court declined to address whether the case law prohibition against "asking a juror to put themselves in the plaintiff's position" when awarding damages also covers asking jurors to put themselves "in the shoes of a parent whose child was subject to discrimination." In the absence of published case law on the question, the court denied the motion with respect to the comments that referred to the jury's family members.

For the references by plaintiff's counsel to $10 million, the court found them not to be in violation of the case law, and it denied the motion with respect to them. It described the references as "downplayed, or mitigated by the reference to what counsel was actually seeking," which for economic damages counsel stated as a "far less" amount.

A-3652-19

B.    The case law on summations.

1.    General standards.    "[C]ounsel is allowed broad latitude in summation." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)).  When the defendant raises an issue or argument in summation, the plaintiff's evaluation and criticism of its weaknesses are permissible as "fair comment." State v. Wilson, 57 N.J. 39, 50-51 (1970).  The scope of legal and emotional conflict at trial may inform the determination of whether the response was proportionate or excessive. State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991).

"When summation commentary transgresses the boundaries of the broad latitude otherwise afforded to counsel, a trial court must grant a party's motion for a new trial if the comments are so prejudicial that 'it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Bender, 187 N.J. at 431 (quoting R. 4:49-1(a)).

Summation comments are to be "viewed in the context of the entire record," State v. Bey, 129 N.J. 557, 620 (1992), and the prejudicial impact of summation comments can be neutralized by a curative instruction. State v. Zola, 112 N.J. 384, 426 (1988).  Accord City of Linden v. Benedict Motel Corp., 370 N.J. Super. 372, 398 (App. Div. 2004) ("a clear and firm jury charge may cure

any prejudice created by counsel's improper remarks during opening or closing argument.").

Juries are generally presumed to understand and follow instructions. State v. Loftin, 146 N.J. 295, 390 (1996); State v. Manley, 54 N.J. 259, 271 (1969) They are also presumed to follow curative instructions in the absence of evidence to the contrary other than one side's disappointment with the verdict. State v. Winter, 96 N.J. 640, 649 (1984).

2.    Standards for particular comments.    Even a comment of a specifically disfavored type, such as disparagement of opposing counsel, is unlikely to cause reversible prejudice if it is brief and isolated. State v. Watson, 224 N.J. Super. 354, 362 (App. Div. 1988) ("fleeting and isolated" comment that "role of defense counsel is to obfuscate the facts" could not have prejudiced jury).

Similarly, while appeals to sympathy are "clearly improper" because they "focus the jury's attention on irrelevant and prejudicial facts," Brodsky v. Grinnell Haulers, Inc., 362 N.J. Super. 256, 265-66 (App. Div. 2003), aff'd in part, rev'd in part on other grounds, 181 N.J. 102 (2004), they do not necessarily have the capacity to cause prejudice if they are mild and fleeting. State v. Marinez, 370 N.J. Super. 49, 55 (App. Div. 2004); Wild v. Roman, 91 N.J.

Super. 411, 419 (App. Div. 1966) (although not reversible error by itself, defense summation "should not have emphasized [the] defendant's youth and that he was 'on the threshold of his career'").

It is improper for a summation to invoke the so-called "golden rule" that urges jurors to award the amount of damages that they would wish to receive. Geler v. Akawie, 358 N.J. Super. 437, 464 (App. Div. 2003) (quoting Botta v. Brunner, 26 N.J. 82, 94 (1958)). Jurors are "not free to adopt what they would want as compensation for injury, pain and suffering"; they are instead required to base a compensatory damages award "upon what a reasonable person would find to be fair and adequate in the circumstances." Ibid.

In a related vein, a party seeking to recover unliquidated damages may not ask the jury "to return a damage award in a specific amount." Weiss v. Goldfarb, 154 N.J. 468, 481 (1998) (citing Botta, 26 N.J. at 102-04). See also Purpura v. Pub. Serv. Elec. & Gas Co., 53 N.J. Super. 475, 479, 482 (App. Div. 1959) (declining to address whether the prejudice of such a comment in conjunction with other improper remarks could have been mitigated by curative instructions).

As the trial court noted, the published case law has only applied the prohibition against golden rule arguments to requests for damage awards that

90

the jurors "would want for their own pain and suffering," citing <u>Henker v. Preybylowski</u>, 216 N.J. Super. 513, 520 (App. Div. 1987). Neither <u>Henker</u> nor any other published case has addressed whether the prohibition also applies when jurors are asked to award what they would want for the pain and suffering of their loved ones.

The case law on the golden rule does not hold that an invocation of it always requires reversal. In <u>Cox v. Valley Fair Corp.</u>, 83 N.J. 381, 385-86 (1980), the Court criticized a summation for having "a subtle appeal to the 'golden rule,'" but it reversed only for the summation's "suggestion of a per diem formula" in violation of "the <u>Botta v. Brunner</u> rule." <u>Ibid.</u> <u>Botta</u> was the leading case to "disapprove of" a suggestion to apply the golden rule. <u>See</u> <u>Cox</u>, 83 N.J. at 384 (citing <u>Botta</u>, 26 N.J. at 94). However, it too declined to base its reversal on the presence of such a suggestion in the summation, and instead reversed because the summation contained an argument for the jury to award damages for pain and suffering by calculations based on a specific per diem dollar amount. <u>Botta</u>, 26 N.J. at 94-105.[7]

---

[7] <u>Rule</u> 1:7-1(b) allows counsel to argue in summation "that unliquidated damages be calculated on a time-unit basis," as long as counsel makes the argument "without reference to a specific sum." The <u>Rule</u> has "clarified and modified <u>Botta</u>'s prohibition against per-diem calculations, <u>Johnson v. Salem</u>

Geler did not treat a reference to the golden rule as different from any other improper comment that can be mitigated by a curative instruction. That case instead addressed a summation with an almost unimaginable panoply of excesses, which reflected what this court could not "escape" seeing as counsel's "calculated determination that any means, however unfair, were justified by the goal of enlarging monetary recovery." Geler, 358 N.J. Super. at 465. The excesses were invocations of the golden rule that counsel made "incessantly . . . through page after page of the transcript" of his summation, along with arguments about harms for which damages were not being claimed, misstatements of "material elements of the evidence," emotionally charged appeals to sympathy, and numerous "derisive and derogatory comments" about the "defendants, their counsel, their witnesses and their evidence in general." Id. at 465-68. This court ruled that the summation "as a whole" and "the absence of curative instructions," not just a few comments that received adequate curative instructions as in this case, compelled a new trial. Id. at 471-72.

The case law likewise does not deem occasional references to a dollar amount for damages as necessarily uncurable by an appropriate instruction. In

_____

Corp., 189 N.J. Super. 50, 59-60 (App. Div. 1983), aff'd as modified on other grounds, 97 N.J. 78 (1984), but the prohibition against making "reference to a specific sum" remains. Weiss, 154 N.J. at 481.

Risko, the Court did not criticize in principle the "suggestion of a $1 million damages floor" in the plaintiff's summation. 206 N.J. at 517. What the Court could not "tolerate" was counsel's injecting himself into deliberations by "suggest[ing] to jurors that they would be violating the law, and will be reported to the judge, if they reject the notion that [the] plaintiff's case could be worth more than $1,000,000." Id. at 520.

C. Analysis.

Applying these principles, we conclude that the comments by plaintiff's counsel were fair comment on those by defense counsel about plaintiff's motivation and his being a liar. Only one comment by plaintiff's counsel was improper, and it was brief, moderate, and adequately mitigated by the jury charge and curative instruction.

We do not view the first mention of family by plaintiff's counsel as an invocation of the golden rule. It was not an appeal to treat plaintiff as if he were a close family member, but rather the naming of family members alongside members of LAD protected categories in order to explain that the LAD applies more broadly than the jurors might suppose.

The second mention of family did name the jurors' close family members in urging the jurors to consider whether the incidents of harassment by

themselves could prove discrimination. That may well qualify as an invocation of the golden rule, although it can also be taken as an attempt to convey that multiple acts of harassment against a particular person can result in meaningfully detrimental discrimination. In any event, sixteen minutes after the jury was discharged following plaintiff's summation, they were brought back to hear the charge, which instructed them not to treat counsel's comments as binding in any way, and to award emotional distress damages fairly and reasonably "without any passion, prejudice, bias, or sympathy." The next morning's curative instruction repeated the caution against bias, prejudice, and "how you feel," and it added an injunction against "personalizing the case" by "how you would feel if this was a family member." This prompt curative measure was sufficient to mitigate the influence of plaintiff's counsel's comment.

Counsel's first reference to $10 million was not a suggestion about how much to award in damages, but rather a statement that a plaintiff seeks an award of that magnitude only in an entirely different kind of case. Counsel's other references to $9 or $10 million were to highlight the modesty of the economic damages claim that counsel himself capped at $160,000. The final reference to $10 million was similarly made to highlight the modesty of plaintiff's request to

be recognized as deserving "something" rather than nothing at all for his emotional distress. If those references were a "signal" that defendants imagine for the jury to keep in mind during deliberations, it was an obscure one that was readily countered by the court's curative instruction to disregard it. For these reasons, we reject defendants' contentions concerning plaintiff's counsel's summation.

## X.

We now turn to the contentions plaintiff raises in his cross-appeal. Plaintiff first argues that the trial court erred by remitting the jury's original punitive damages award to a lower figure. He argues that the award was justified because Davenport was a member of upper management, and his history of egregious discrimination against plaintiff justified the jury's implicit conclusion that his denial of the promotion and of the opportunity to seek it satisfied the standards for punitive damages against a public entity.

As discussed in Section VI of this opinion, the trial court's decision about the amount of a punitive damages award is reviewed for abuse of discretion. Maudsley, 357 N.J. Super. at 590; Abbamont, 138 N.J. at 432; Leimgruber, 73 N.J. at 456.

The trial court upheld the jury's findings of "especially egregious conduct" with actual malice or willful and wanton disregard by a member of upper management. However, it found that "many" of the acts of harassment were "not necessarily discriminatory," and that it was uncertain which ones the jury viewed as discriminatory. Plaintiff does not challenge the court's findings that the discrimination did not injure him as severely as it might have, that he did not seek mental health treatment for his emotional distress or miss work because of it, and that he was "well compensated" for it as well as for his economic damages.

The trial court adhered to the case law referenced in Section VI that makes proportionality a consideration notwithstanding the Act's exemption of LAD claims. There is no minimum amount at law for a punitive damages award, so the court did not disregard any governing standard by moderately reducing the award against the public entity defendants here to approximate the total compensatory damages award. Therefore, plaintiff's argument on this point lacks merit.

XI.

Plaintiff next asserts that the trial court erred by dismissing on summary judgment his claims against all defendants for hostile work environment and

aiding and abetting and then denying his motion for reconsideration of that ruling. Plaintiff argues that he established prima facie cases for all of those claims, and that the numerous material factual disputes involving witness credibility precluded summary judgment, which made it error for the court to decide that he had not made out a prima facie case of the requisite "severe" or "persuasive" discrimination. We are unpersuaded by these contentions.

In dismissing plaintiff's claims relating to hostile work environment, the trial court observed that plaintiff did not know about some of the discriminatory harassment until Lance's deposition, which was taken after plaintiff retired. It noted that plaintiff alleged just two incidents after he returned to work following his year-long military deployment. It found that the incidents of which plaintiff was aware before his retirement did not amount to discriminatory harassment that satisfied the governing case law's requirement of being "severe and pervasive." The court also found that the harassment incidents before plaintiff's deployment would be time-barred under the LAD's two-year statute of limitation. It then denied plaintiff's motion for reconsideration, on the ground that plaintiff could not satisfy the "severe and pervasive" test even if none of the incidents he alleged were time-barred.

The standard of review set out in Section II of this opinion for grants or denials of summary judgment applies here.  A reviewing court should not overturn the grant or denial of reconsideration absent a "clear abuse of discretion." Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (quoting Hous. Auth. of Morristown v. Little, 135 N.J. 274, 283 (1994)).

All LAD claims are subject to the two-year statute of limitation for claims of personal injury. Montells v. Haynes, 133 N.J. 282, 286 (1993).  That statute requires a lawsuit "for an injury to the person caused by the wrongful act, neglect or default of any person" to "be commenced within two years next after the cause of any such action shall have accrued."  N.J.S.A. 2A:14-2(a).  For a claim of hostile work environment, the limitation period begins to run from the occurrence of the last act in a pattern that establishes a unitary "continuing violation" comprising acts that would not be separately actionable even if timely. Roa, 200 N.J. at 566-68

The LAD allows claims of unlawful discrimination based on the employer's creation or tolerance of a hostile work environment. Lehmann, 132 N.J. at 601-03).  Such a claim requires employees to prove that the discrimination "would not have occurred but for" their being members of a protected class, and that the conduct was "severe or pervasive enough" to make

a "reasonable" employee who belongs to that class "believe that . . . the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04.

Such a claim "frequently arises out of repeated incidents that take place over time and by their cumulative effect make it unreasonable and unhealthy for the plaintiff to remain in that work environment." Caggiano v. Fontoura, 354 N.J. Super. 111, 126 (App. Div. 2002). A proper regard for "the totality of the circumstances" requires consideration of "the cumulative effect of the various incidents," which "may exceed the sum of the individual episodes." Cutler v. Dorn, 196 N.J. 419, 431 (2008) (citations omitted).

More specifically, "severe or pervasive" conduct may be established by proof of "numerous incidents that, if considered individually, would be insufficiently severe to state a claim." Lehmann, 132 N.J. at 607. Our courts "have adopted the continuing violation concept, analogous to the continuing tort doctrine applied in other contexts, to permit recovery for the entire pattern of conduct that culminates in a hostile environment, despite the fact that some of that conduct occurred outside the otherwise applicable limitations period." Ibid. The plaintiff must connect the actions by showing that at least one occurred during the limitation period, and that "the discrimination is more than the

occurrence of isolated or sporadic acts of intentional discrimination and is instead a continuing pattern of discrimination." Mancini v. Township of Teaneck, 349 N.J. Super. 527, 557 (App. Div. 2002), aff'd as mod. on other grounds, 179 N.J. 425 (2004). A key factor in determining whether acts were discrete or connected is "permanence," meaning "whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." Ibid.

The Lehmann test uses an "objective" standard rather than "the reaction of the individual plaintiff" to evaluate the effects of the acts in question on the plaintiff's conditions of employment, because the LAD's purpose "is to eliminate real discrimination and harassment." Lehmann, 132 N.J. at 611-12. That standard encompasses the broad span of reasonable reactions by "both sensitive and tough people," including a "normal and common" emotional component. Id. at 613-14.

After reviewing the record in light of these principles, we are satisfied that the trial court properly determined that plaintiff could not have satisfied the severe-and-pervasive test for hostile work environment claims. Plaintiff presented no evidence that the harassment, even cumulatively, affected the conditions of his employment. With respect to the entire relevant period, he did

100

not allege a change in his workdays and hours, his ability to request leave, the actual accommodation of his military leave as scheduled, his work assignments, or his work relationships, much less allege a connection between any such change and any of the incidents.[8]  Plaintiff's argument therefore fails.[9]

## XII.

Plaintiff argues that the trial court erred by failing to include prejudgment interest in his compensatory damages award for front pay.  He asserts that Rule 4:42-11(b) mandates the award of prejudgment interest on all successful tort claims.  This contention lacks merit.

The trial court's final judgment awarded prejudgment interest on the awards for back pay and for emotional distress, but not on the award for front pay.  The court's decision was consistent with well-established case law

---

[8]  Plaintiff further argues that his claims were timely by virtue of a federal enactment that tolls all statutes of limitation during military service.  In addition, he argues that the LAD allows personal liability of an employee for aiding and abetting.  However, these arguments were mooted by the trial court's reliance on the severe-and-pervasive test.  Therefore, we need not address plaintiff's contentions on this point.

[9]  In a separate point heading, plaintiff argues that the trial court incorrectly ruled against him on a number of evidentiary matters and, in the event of a remand, those rulings could be litigated anew.  This contention is also moot because no remand is necessary here.

A-3652-19

declaring prejudgment interest to be inappropriate for awards of "future lost wages."

While Rule 4:42-11(b) mandates the award of prejudgment interest "in tort actions," that mandate applies "except as otherwise provided by law." The Rule itself provides an applicable exception: "Prejudgment interest shall not, however, be allowed on any recovery for future economic losses." R. 4:42-11(b). The prohibition was added to the Rule by amendment as of July 1, 2003. Marko v. Zurich N. Am. Ins. Co., 386 N.J. Super. 527, 529 (App. Div. 2006). "Economic losses" means "loss of income," but it does not mean "non-economic losses, including . . . pain and suffering and disability." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.2.1 on R. 4:42-11 (2024).

That limitation of the prohibition to future economic losses like front pay is consistent with the prior case law, which held the award of prejudgment interest for such losses to be improper. Prejudgment interest has been explained as "cover[ing] the value of the award for the period during which the defendants had the use of the moneys to which [the] plaintiffs are found to be entitled." Busik v. Levine, 63 N.J. 351, 360 (1973). That is apt for back pay, which accrues before the judgment, but not for front pay, which does not begin to accrue until after the judgment. Accord Gallo v. Salesian Soc., Inc., 290 N.J.

Super. 616, 662 (App. Div. 1996) ("when a plaintiff is compensated for future lost wages, prejudgment interest is improper."); Gilbert v. Durand Glass Mfg. Co., Inc., 258 N.J. Super. 320, 332 (App. Div. 1992) (the "rationale, that [the] defendant had exclusive use of the monies that [the] plaintiff would have earned and was entitled to recover, is also inapplicable" to "future wage loss"). Therefore, the trial judge correctly denied plaintiff's request for pre-judgment interest on the front pay award.

## XIII.

Finally, plaintiff argues that the trial court abused its discretion by not awarding him all of the counsel fees and costs he sought in his application. We disagree.

The standards governing our review of a trial judge's decision on an application for counsel fees and costs are well established. A trial court's award of counsel fees "will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." Rendine, 141 N.J. at 317. The first step in determining the fee award is calculating the "lodestar," which is a reasonable hourly rate for counsel's services multiplied by the number of hours reasonably expended. Walker v. Giuffre, 209 N.J. 124, 130-31 (2012). This is "the most significant element in the award of a reasonable fee because that function

requires the trial court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application." Rendine, 141 N.J. at 335.

The Supreme Court has cautioned that trial courts "should not accept passively the submissions of counsel to support the lodestar amount[.]" Ibid. "'It does not follow that the amount of time actually expended is the amount of time reasonably expended.'" Ibid. (quoting Copeland v. Marshall, 641 F.2d 880, 891 (D.C. Cir. 1980)). Hours are not considered reasonably expended if they are "excessive, redundant, or otherwise unnecessary" or are spent on "claims on which the party did not succeed" or "that were distinct in all respects from claims on which the party did succeed." Ibid. (internal quotation marks and citations omitted).

In his September 2019 fee certification, plaintiff's counsel stated that he had represented plaintiff in this matter since April 2014. He worked on a one-third contingency basis plus plaintiff's retainer of $10,000, and he charged plaintiff only for costs totaling $8,625.66. He spent 1,385.68 hours on the matter, as supported by his daily time records, and he multiplied that by his hourly rate of $500 to yield a "lodestar fee" of $692,840.

Counsel represented that the hours "relate" only to the failure to promote claim, with no hours "relating to" the hostile work environment claim that was dismissed or to work on plaintiff's prior action about discrimination in the 2006/2007 promotion process. He argued that plaintiff was entitled to the full lodestar amount because he was the prevailing party on the failure to promote claim, and that the fee was reasonable for the verdict that he obtained.

Defendants responded to counsel's fee request by identifying certain daily work items as excessive, and by citing Monmouth County LAD cases in which the hourly fee awarded was lower. Plaintiff's counsel submitted a reply certification and annexed information about the hourly fee awarded in LAD cases in other counties.

The trial court found that plaintiff's counsel simply declared this case's complexity without explaining why the issues were complex or novel. It also found insufficient evidence of his experience, skill, and reputation because he did not claim to be a certified trial attorney, a member of other state or federal bars, or of "networking or peer organizations" for employment lawyers or lawyers in general.

The court further found an absence of proof in counsel's initial and supplemental submissions of what "comparable attorneys in the community

A-3652-19

charge for similar services," of hourly rates for LAD cases in Monmouth County, of sworn statements or affidavits attesting to the reasonableness of his rate, of his having charged other clients $500 an hour, or "examples of what non-contingent clients pay." Based upon this analysis, the court set the hourly rate for the fee calculation at $425, which it called "on the higher end of the spectrum of [those] cases."

The court reduced the requested number of hours by disallowing eighteen items that it deemed excessive, duplicative, or useful to counsel in other cases as well as this one. They totaled 41.8 hours, which reduced the number of hours not disallowed on that ground to 1,343.8.

Turning to the degree of plaintiff's success, the court noted counsel's admission that plaintiff did not prevail on the hostile work environment claim or the prior action. While counsel claimed to have excluded the hours he spent on them, he did not demonstrate how he made that adjustment. However, the court recognized that the hostile work environment and failure to promote claims overlapped to some extent, which would make it inappropriate to reduce counsel's hours by simplistic measures such as the number of parties or counts dismissed before trial. It accordingly subtracted an additional seventy hours,

slightly more than one-tenth the reduction that defendants sought, which further reduced the hours in the lodestar to 1,273.8.

On the question of fee enhancement, the court observed that there was a "wide range of outcomes" in our case law with "no objective criteria" to explain it. Taking the case on a contingency basis was not dispositive, because plaintiff's counsel was able to mitigate the "actual risk of nonpayment" by spending an average of only five hours per week on this case to incur the claimed 1,385.8 hours. Counsel also had additional sources of income, as the owner of his law firm and the managing member of a human resources consulting firm, and there was "no evidence that any other attorney declined to take" this case "because of uncertainty" about being paid or about receiving an enhancement.

The court "appreciate[d] that eradicating discrimination serves a very important public policy" and that lawyers must be willing to "take these very important cases" on a contingency basis. However, "the elephant in the room" was that an enhancement in addition to counsel's one-third contingency fee was already a "tremendous incentive in taking one of these cases." The court concluded that other than the contingency fee and the "very important public interest," there was "nothing that stands out in this case that would justify a

A-3652-19

significant upward departure."  The court accordingly awarded an enhancement of ten percent, which was "well within the range suggested by Rendine."

Based upon the foregoing discussion, it is abundantly clear that the trial court thoroughly scrutinized the fee request of plaintiff's counsel as the case law requires, and it appropriately found insufficient support for the $500 hourly rate. The court properly identified a small number of work hours to disallow for excess or duplication.  Despite counsel's presentation of billing records since 2014 that did not clearly indicate that any of the work was on the failure to promote claim as opposed to the hostile work environment claim, the court declined to treat those claims as wholly separate, in line with its recognition during trial and the charge conference that they had a substantially similar set of facts that made the evidence of workplace harassment and of Davenport's discriminatory animus admissible on failure to promote notwithstanding the dismissal of the hostile work environment claim.

On the requested fee enhancement, the trial court correctly found that counsel relied mostly on rhetoric to show that plaintiff would have had difficulty engaging an attorney of similar experience and skill to take this case on a contingency basis and at the hourly rate it allowed.  Counsel also failed to explain why this case, about discrimination that he has continuously

A-3652-19

characterized at trial and on appeal as uniquely egregious and "extreme," was as complex and challenging to prove as other employment discrimination cases that go to trial, and therefore in need of an enhancement beyond the usual contingency fee to attract representation. Counsel spent an average of only five hours a week on this case, which mitigated the risk of hardship from nonpayment by substantially avoiding derogation of his work for other clients. Nonetheless, the court awarded a ten-percent enhancement to reflect the important public interest in eradicating discrimination. We discern no abuse of discretion in any of the court's counsel fee determinations.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3652-19